# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

## CONCISE SUMMARY OF THE CASE

Pursuant to 3rd Cir. LAR 33.3, counsel are required to file a concise summary of the case within **14** days of the date of docketing of the Notice of Appeal. Total statement is limited to no more than 2 pages, single-spaced.  Counsel may utilize this form or attach a 2 page statement encompassing the information required by this form.

SHORT
CAPTION:_____

USCA NO.: _____

LOWER COURT or AGENCY and DOCKET NUMBER:

_____

NAME OF
JUDGE:_____

Specify who is suing whom, for what, and the subject of this action.  Identify (1) the nature of the action; (2) the parties to this appeal; (3) the amount in controversy or other relief involved; and (4) the judgment or other action in the lower court or agency from which this action is taken:

LIST and **ATTACH** a copy of each order, judgment, decision or opinion which is involved in this appeal.  If the order(s) or opinion(s) being appealed adopt, affirm, or otherwise refer to the report and recommendation of a magistrate judge or the decision of a bankruptcy judge, the report and recommendation or decision shall also be attached.

Provide a short statement of the factual and procedural background, which you consider important to this appeal:

Identify the issues to be raised on appeal:

This is to certify that this Concise Summary of the Case was electronically filed with the Clerk of the U.S. Court of Appeals for the Third Circuit and a copy hereof served to each party or their counsel of record

this _____ day of _____,20_____.

_____
Signature of Counsel

Rev. 07/2015

# CONCISE STATEMENT

This matter concerns two longstanding marks utilized by Defendants Latinfood U.S. Corp. d/b/a Zenú Products Co. and Wilson Zuluaga (collectively "Latinfood" or "Defendants") for two food products sold by Defendants here in the United States: Zenú and Ranchera meat products. Although the Ranchera mark was never formally registered by Latinfood, it possesses a valid and subsisting U.S. Registration (No. 4,402,942) for its longstanding Zenú U.S. Trademark.

Plaintiff Industria de Alimentos Zenú S.A.S. ("Industria" or "Plaintiff")—a Colombian corporation—claims these same Zenú and Ranchera trademarks here in the United States despite never having advertised, introduced, or sold any of its Colombian Zenú or Ranchera products in the United States. It nonetheless brought suit against Latinfood for alleged trademark infringement, false advertising, misrepresentation of source, and unfair competition pursuant to the Lanham Act (15 U.S.C. 1051 et seq.) and related state law claims; copyright infringement (17 U.S.C. 501 et seq.); and for violations of the Inter-American Convention for Trademark and Commercial Protection ("IAC"). Plaintiff's lawsuit seeks damages, injunctive relief, attorney fees and cancellation of Latinfood's longstanding Zenú U.S. Trademark.

Latinfood brings this instant interlocutory appeal of the District Court's decision—on summary judgment—to permanently enjoin Latinfood from using its Zenú and Ranchera marks in U.S. commerce pursuant to Article 18 of the IAC, the related cancellation of Defendants' longstanding Zenú U.S. Trademark pursuant to Article 8 of the IAC, and related decision to grant summary judgment as to Plaintiff's claim for source misrepresentation under § 14(3) of the Lanham Act.

The specific issues related to the District Court's award of injunctive relief, to be addressed appeal, are as follows:

1. Whether, in a case of first impression in this Circuit and contrary to the law of the Second Circuit, the District Court was correct in concluding that the IAC inherently possesses a private right of action providing rights and remedies above and beyond those set forth within the operative provisions of the Lanham Act.

2. Whether, in a case of first impression in this Circuit and contrary to the law of the Second Circuit, the District Court erred by improperly affording Plaintiff the priority rights set forth under § 44(d) despite Plaintiff's non-compliance with the appropriate procedures.

3. Whether, the District Court improperly ordered an immediate and permanent injunction against Defendants use of their longstanding Zenu and Ranchera marks, and related immediate cancellation of Defendants' longstanding Zenu mark, pursuant to Articles 8 and 18 of the IAC, without requisite due process consideration of the Third Circuit's injunctive relief factors, *see Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001), and based solely on Industria's foreign Colombian trademark registrations.

4. Whether the District Court improperly concluded that Industria has standing to pursue trademark claims under the Lanham Act where it never used its foreign trademarks in United States—a question never addressed by the Third Circuit—and despite Industria abandoning its U.S. trademarks for Zenú and Ranchera and having no name recognition in the U.S. Indeed, the District Court created new law in ordering the immediate injunction

and cancellation of a longstanding U.S. trademark registrations based solely on usage abroad.

5. Whether Plaintiff's claims are in fact barred by the fundamental territoriality principle, which recognizes that a trademark has a separate existence in each sovereign territory in which it is registered or legally recognized as a mark.

6. Whether the District Court's factual determinations undermining its award of injunctive relief and cancellation under the IAC were against the clear weight of the evidence and should not have been granted on summary judgment in any event.

7. Whether the District Court erred by improperly granting Industria's source misrepresentation claims under § 14(3) of the Lanham Act. Specifically, whether the District Court erred as a matter of law by allowing a foreign petitioner to proceed under § 14(3) upon ownership of foreign marks that it did not use in United States commerce. Additionally, whether the District Court erred in concluding that there was no genuine issue of material fact that Defendants' application to the USPTO was fraudulent on three separate and independent grounds.

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **INDUSTRIA DE ALIMENTOS ZENU S.A.S.,** | |
| **Plaintiff/Counter Defendant,** | Civ. No. 16-6576 (KM) (MAH) |
| **v.** | **OPINION** |
| **LATINFOOD U.S. CORP. d/b/a ZENU PRODUCTS CO. and WILSON ZULUAGA,** | |
| **Defendants/Counter Claimants/Third Party Plaintiffs,** | |
| **v.** | |
| **CORDIALSA USA, INC.** | |
| **Third Party Defendant,** | |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Industria De Alimentos Zenu S.A.S. ("Industria"), commenced this trademark and copyright action against Latinfood U.S. Corp. doing business as Zenu Products Co. ("Latinfood"), and Wilson Zuluaga[1]. Latinfood also asserted a counterclaim for tortious interference with prospective economic advantage against Industria and Cordialsa, Inc. ("Cordialsa").

Fact discovery is complete, and now before the Court are two motions for summary judgment.[2] In the first, plaintiff Industria moves for summary

---

[1]   Mr. Zuluaga has since legally changed his name to "Jack Wilson" because, he says, "he feared for his life from Industria." (Pl. St. ¶ 22; Def. Resp. ¶ 22.) For consistency with the docket and the defendants' own summary judgment papers, I will refer to him as Mr. Zuluaga.

[2]   This case has been pending since 2016, in no small part because of the manner in which it has been litigated before the Magistrate Judge. (*See infra; see also* the

judgment on its own claims, and Industria and Cordialsa jointly move for summary judgment in opposition to defendants' counterclaims. (DE 265.) In the second, defendants Latinfood and Zuluaga jointly move for summary judgment in opposition to Industria's claims, but do not move for summary judgment on their counterclaims. (DE 268.) For the reasons expressed below, as to Industria's claims, Industria's motion for summary judgment is **GRANTED in part and DENIED in part** and Latinfood and Zuluaga's motion for summary judgment is **GRANTED in part and DENIED in part**. As to defendants' counterclaims, Industria and Cordialsa's motion for summary judgment is **GRANTED**.

## I. BACKGROUND

### A. Facts[3]

Industria is "a foreign corporation organized under the laws of Colombia and with its principal place of business in Medellín, Colombia." (Def. St. ¶ 1; Pl.

---

court's accompanying decision on appeal from discretionary discovery-related rulings of the Magistrate Judge.)

[3] Certain citations to record are abbreviated as follows:

"DE" = Docket entry number in this case

"Compl." = Industria's Amended Complaint (DE 31)

"Counterclaims" = Latinfood and Mr. Zuluaga's Third-Amended Answer to Amended Complaint, Counterclaim against Industria, and Third-Party Complaint against Cordialsa (DE 89)

"MTD Op." = Court's Opinion Denying Defendants' Motion to Dismiss the Amended Complaint (DE 81)

"Pl. Mot." = Industria and Cordialsa's Memorandum of Law in Support of their Motion for Summary Judgment (DE 265-1)

"Pl. St." = Industria and Cordialsa's Statement of Undisputed Facts (DE 265-2)

"Kadosh Decl." = Declaration of Samuel Kadosh In Support of Industria and Cordialsa's Motion For Summary Judgment (DE 266)

"Salazar Decl." = Declaration of Luis Ignacio Salazar In Support of Industria and Cordialsa's Motion For Summary Judgment (DE 267)

"Def. Mot." = Latinfood and Mr. Zuluaga's Memorandum of Law in Support of their Motion for Summary Judgment (DE 268-1)

Resp. ¶ 1.) Industria produces and distributes food products under two brand names relevant to this dispute: Zenú and Ranchera.[4] (*See* Pl. St. ¶ 1; Def. Resp. ¶ 1.) Industria's Zenú-branded products, which it has sold in Colombia for more than 60 years, include various meat products, canned vegetables, and

---

"Def. St." = Latinfood and Mr. Zuluaga's Statement of Undisputed Facts (DE 268-3)

"Ingber Decl." = Declaration of Mark J. Ingber In Support of Latinfood and Mr. Zuluaga's Motion for Summary Judgment (DE 269)

"Def. Op." = Latinfood and Mr. Zuluaga's Memorandum in Opposition to Industria and Cordialsa's Motion for Summary Judgment (DE 273)

"Def. Resp." = Latinfood and Mr. Zuluaga's Response and Objections to Industria and Cordialsa's Statement of Material Facts (DE 273-1)

"Def. Supp. St." = Latinfood and Mr. Zuluaga's Supplemental Statement of Disputed Material Facts (DE 273-2)

"Ingber Op. Decl." = Declaration of Mark J. Ingber In Support of Latinfood's and Mr. Zuluaga's Memorandum in Opposition To Industria and Cordialsa's Motion For Summary Judgment (DE 273-3)

"Def. Cross Mot." = Latinfood and Mr. Zuluaga's Cross Motion for Attorney Fees (DE 274)

"Pl. Op." = Industria and Cordialsa's Memorandum of Law in Opposition to Latinfood and Mr. Zuluaga's Motion for Summary Judgment (DE 275)

"Pl. Resp." = Industria and Cordialsa's Response to Latinfood and Mr. Zuluaga's Statement of Material Facts (DE 275-1)

"Kadosh Op. Decl." = Declaration of Samuel Kadosh in Opposition to Latinfood and Mr. Zuluaga's Motion for Summary Judgment (DE 275-2)

"Def. Reply" = Latinfood and Mr. Zuluaga's Reply Brief in Support of Motion for Summary Judgment (DE 279)

"Ingber Reply Decl." = Reply Declaration of Mark J. Ingber in Support of Latinfood and Mr. Zuluaga's Motion for Summary Judgment (DE 279-1)

"Pl. Reply" = Industria and Cordialsa's Reply Brief in Support of Motion for Summary Judgment (DE 280)

"Pl. Supp. Resp." = Industria and Cordialsa's Response to Latinfood and Mr. Zuluaga's Supplemental Statement of Disputed Material Facts (DE 280-1)

[4] For this statement, and many others, Latinfood "denies" the statement on the basis that it is not material, but does not otherwise dispute it factually. Where Latinfood has objected to a fact on the basis of materiality, the Court has construed the factual statement as admitted and will separately consider materiality as appropriate.

frozen dishes. (Pl. St. ¶¶ 2–3; Def. Resp. ¶¶ 2–3.) The Zenú packaging displays "the Zenú mark in red stylized type; red and white packaging; and photographs of the food on a white background." (Pl. St. ¶ 4; Def. Resp. ¶ 4.) Industria's Ranchera-branded products, which it has sold in Colombia for more than 30 years, include various meat products and sausages. (Pl. St. ¶¶ 5–6; Def. Resp. ¶¶ 5–6.) The Ranchera name is displayed on packaging in a red "western" or "rancher-inspired" font which is "outlined first in white and then in black, curving slightly upward in the middle of the word." (Pl. St. ¶ 7; Def. Resp. ¶ 7.) For Ranchera "salchicha" sausages, a "rancher theme" is used on the packages showing a family around a campfire at sunset. (Pl. St. ¶ 9; Def. Resp. ¶ 9.)

From 2012 to 2017, Industria "spent over $33 million in advertisement for its Ranchera products line and over $77 million in advertisement for its Zenú products line including for advertisement on television, radio and magazines." (Pl. St. ¶ 15; Def. Resp. ¶ 15.) Annually, Industria makes approximately $300,000,000 in sales of Zenú products and $100,000,000 in sales of Ranchera products. (Pl. St. ¶ 16; Def. Resp. ¶ 16.) However, Industria does not advertise or sell its Zenú or Ranchera products in the United States.[5] (Def. St. ¶¶ 6–7, 14; Pl. Resp. ¶¶ 6–7, 14.) Industria has also not conducted any market surveys specific to the United States for its Zenú or Ranchera marks. (Def. St. ¶ 34; Pl. Resp. ¶ 34.)

Industria has never owned a registered U.S. trademark for Ranchera. (Def. St. ¶ 4; Pl. Resp. ¶ 4.) On November 14, 2016, Industria filed an application with the U.S. Patent and Trademark Office ("USPTO") to register its Ranchera mark, but a U.S. corporation (unrelated to this action) filed a notice of opposition to the application based on its ownership of a U.S. trademark for "Ranchero." (Def. St. ¶¶ 21–22; Pl. Resp. ¶¶ 21–22.) On November 6, 2019, the USPTO suspended the opposition proceeding until resolution of the instant

---

[5] The parties do not dispute that from 2012 to 2017 Industria's website has been accessed on thousands of occasions by people located in the United States. (Pl. St. ¶¶ 17–18; Def. Resp. ¶¶ 17–18.)

action. (Def. St. ¶ 22; Pl. Resp. ¶ 22.) Additionally, although Industria once
owned a registered U.S. trademark for Zenú, such registration is no longer in
effect. (Def. St. ¶ 2; Pl. Resp. ¶ 2.) Industria never sold any Zenú or Ranchera
products in the United States when it owned that registered trademark. (Def.
St. ¶ 61; Pl. Resp. ¶ 61.)

Mr. Zuluaga was born in Medellín, Colombia, and lived in Colombia until
he was approximately 17 years old. (Pl. St. ¶¶ 19–20; Def. Resp. ¶¶ 19–20.) In
around 2010, Mr. Zuluaga founded a company called HWZ Distributors
("HWZ"). (Pl. St. ¶ 24; Def. Resp. ¶ 24.) "HWZ distributed perishable and non-
perishable food products, including panela, guava-based snacks, beverages,
and meat products such as sausages." (Pl. St. ¶ 25; Def. Resp. ¶ 25) "HWZ
distributed its products in New York, New Jersey and Connecticut," and
generally targeted customers of Hispanic origin. (Pl. St. ¶¶ 26–27; Def. Resp.
¶¶ 26–27.)

At some point after founding HWZ, Mr. Zuluaga began distributing
products under the Zenú name. The parties dispute when Mr. Zuluaga first
used the Zenú name in commerce, with Mr. Zuluaga claiming first use in 2011.
(Def. St. ¶ 16; Pl. Resp. ¶ 16.) On January 25, 2013, HWZ submitted an
application to register the Zenú trademark with the USPTO through a filing
service called Idaho Falls IS USTM Corp. ("USTM"). (Pl. St. ¶¶ 28–29; Def. Resp.
¶¶ 28–29.) The application bears Mr. Zuluaga's signature. (Pl. St. ¶ 32; Def.
Resp. ¶ 32.) Attached to that application were exemplars consisting of actual
images of Industria's products. (Pl. St. ¶ 33; Def. Resp. ¶ 33.) Mr. Zuluaga
disclaims any knowledge of this act by USTM, and claims to have been
unaware of Industria's Zenú mark prior to the filing of that application. (*See* Pl.
St. ¶ 30; Def. Resp. ¶ 30.) The USPTO registered the Zenú trademark to HWZ
for International Class 29 goods on September 17, 2013. (Pl. St. ¶ 36; Def.
Resp. ¶ 36.) That same day, HWZ recorded an assignment of its entire interest
in the Zenú trademark to Latinfood, the successor company to HWZ. (Pl. St.
¶ 37; Def. Resp. ¶ 37; Def. St. ¶¶ 16–17; Pl. Resp. ¶¶ 16–17.) Almost two years
after the initial trademark registration, Mr. Zuluaga wrote an email to USTM

stating that "we need to replace / change the pic of the specimen loaded in the application. . . . [T]he one showed in the application is not mine." (Pl. St. ¶ 34; Def. Resp. ¶ 34.)

At some point in 2013, "HWZ was wound down and Mr. Zuluaga founded Latinfood . . . as the successor company to HWZ." (Pl. St. ¶ 37; Def. Resp. ¶ 37.) Latinfood is a distributor of perishable and non-perishable food items such as groceries, brown sugar, beverages, processed meats, flour, and corn. (Pl. St. ¶ 38; Def. Resp. ¶ 38.) Latinfood targets primarily Hispanic customers in the U.S. (Pl. St. ¶ 39; Def. Resp. ¶ 39.)

Mr. Zuluaga used a company called Cibao Meats Products ("Cibao") to design Latinfood's Zenú and Ranchera product labels and recipes. (Pl. St. ¶¶ 44, 63; Def. Resp. ¶¶ 44, 63.) Mr. Zuluaga instructed Ms. Jaline Isidor Horta, a marketing assistant at Cibao, to look at Industria's website when creating Latinfood's packaging designs. (Pl. St. ¶¶ 46–53; Def. St. ¶¶ 46–53; Def. Supp. St. ¶ 20; Pl. Supp. Resp. ¶ 20.) Mr. Zuluaga also brought one of Industria's Ranchera labels to Ms. Isidor's office.[6] (Pl. St. ¶ 57; Def. Resp. ¶ 57.)

Examples of both Industria's and Latinfood's Zenú and Ranchera labels are attached to this opinion as Exhibit A. (Kadosh Decl. Exs. 16–17, 20–21; Salazar Decl. Exs. D–G, V–W; Pl. St. ¶¶ 65–66, 68–69; Def. Resp. ¶¶ 65–66, 68–69.)[7] However, Latinfood has since modified its Zenú mark, which is attached to this Opinion as Exhibit B. (Kadosh Decl. Exs. 18–19; Pl. St. ¶ 67; Def. Resp. ¶ 67.)

Some of Latinfood's Zenú and Ranchera product labels state that the product is manufactured or distributed by "Zenú Products US, Inc."; display the web address www.zenu.us.com; and contain the phrase "Linea de

---

[6]     The parties agree that Mr. Zuluaga advised Ms. Isidor to look at Industria's website, but disagree as to the remainder of the conversation. Latinfood does not dispute that Mr. Zuluasga brought the label to Ms. Isidor, but appears to dispute the reason for doing so.

[7]     Latinfood asserts that these labels are no longer in use, but does not dispute that it previously used these labels.

Exportacion," which translates to "exportation line." (Pl. St. ¶¶ 71–73; Def. Resp. ¶¶ 71–73.) Latinfood does not export its Zenú or Ranchera products outside the United States. (Pl. St. ¶ 74; Def. Resp. ¶ 74.) In 2016, the Latinfood website contained the phrase "We have products from" followed by marks of imported brands, among which was an image of Industria's Zenú mark.[8] (Pl. St. ¶ 75; Def. Resp. ¶ 75.) Advertisements made for Latinfood Zenú products used the phrase "una deliciosa tradición," which translates to "a delicious tradition." (Pl. St. ¶ 76; Def. Resp. ¶ 76.)

Latinfood sold its products in various supermarkets. One supermarket, Food Fair, sold Latinfood's products in an aisle designated for "Hispanic and Latin imported goods," despite having another aisle designated for similar goods made in the U.S. (Pl. St. ¶¶ 80–81; Def. Resp. ¶¶ 80–81.) On July 15, 2015, Alejandro Yepes, a sales manager for Cordialsa, made a visit to Food Fair. (Pl. St. ¶ 120; Def. Resp. ¶ 120.) Yepes told Elvis Rodriquez, the manager of Food Fair, that he was "surprised to find" Zenú-marked products at the store. (Pl. St. ¶ 121; Def. Resp. ¶ 121.) It is unclear whether, as part of that conversation, Mr. Yepes stated that the Zenú products were "fake." (*See* Pl. St. ¶ 127; Def. Resp. ¶ 127.) As it turns out, Mr. Zuluaga was also at Food Fair on July 15. After Mr. Rodriguez explained to Mr. Zuluaga what Mr. Yepes's had said, Mr. Zuluaga confronted Mr. Yepes. (Pl. St. ¶ 137; Def. Resp. ¶ 137.) Sometime after this interaction, Food Fair ceased carrying Latinfood's products. (Pl. St. ¶¶ 145–149; Def. Resp. ¶¶ 145–149.) Food Fair's reason for doing so is unclear. (*Id.*)

Industria asserts that it had plans to sell its Zenú and Ranchera products in the United States; however, the extent of Industria's plans and the reason for Industria's decision not to import its products is heavily disputed by the parties. (*See generally* Pl. St. ¶¶ 84–106, 119; Def. Resp. ¶¶ 84–106, 119.)

---

[8]     Defendants assert that this was only an interim website, but do not dispute that the website was publicly available online. (*See* Def. Resp. ¶ 75; Kadosh Decl. Ex. 43 Zuluaga Tr. 181:22–25, 184:15–22.) Mr. Zuluaga denies that he personally authorized the placement of the website online.

In December 2010 and January 2011, Industria and Cordialsa took steps to import Zenú-marked goods into the United States. (Pl. St. ¶¶ 84, 86–87; Def. Resp. ¶¶ 84, 86–87.) However, at some point, Industria paused its import plans, for reasons that are disputed by the parties. (Pl. St. ¶ 90; Def. Resp. ¶ 90) Industria asserts it paused its plans because Cordialsa did not have a large enough distribution network for the endeavor to be profitable, whereas Latinfood cites United States restrictions on importing certain foods. (*See id.*) Industria claims that, in 2014, it restarted its plans to import Zenú-marked goods into the United States because Cordialsa's distribution network had grown, thereby increasing the potential for sales. Latinfood disputes that contention and states that Industria still could not import its goods in 2014 because of sanitary reasons and import restrictions. (*See* Pl. St. ¶ 91; Def. Resp. ¶ 91; Def. St. ¶¶ 58–60; Pl. Resp. ¶¶ 58–60)

The date on which Industria first became aware of Latinfood's Zenú and Ranchera products is in dispute, but it was sometime between October 2013 and September 2014. (Def. Supp. St. ¶ 15; Pl. Supp. Resp. ¶ 15; Def. St. ¶¶ 42, 45, 47; Pl. Resp. ¶¶ 42, 45, 47.) On September 9, 2014, Industria filed a Petition for Cancellation of Latinfood's Zenú mark with the Trademark Trial and Appeal Board ("TTAB"). (Pl. St. ¶ 115; Def. Resp. ¶ 115.) On November 20, 2014, Industria filed an application with the USPTO to register its Zenú mark for International Class 29 goods.[9] (Pl. St. ¶ 116; Def. Resp. ¶ 116.) On October 4, 2015, Industria received a suspension notice in connection with its application to register its Zenú mark. The notice stated that that the civil proceeding in connection with its Petition for Cancellation "pertains to an issue that could directly affect whether applicant's mark can be registered." (Pl. St. ¶ 117; Def. Resp. ¶ 117.) On November 7, 2016, the proceeding in connection with Industria's Petition for Cancellation was suspended. (Pl. St. ¶ 118; Def. Resp. ¶ 118.)

---

[9]     Latinfood describes this as a "non-use application." (Def. Resp. ¶ 116.)

### B. Procedural History

Industria initiated this action on October 5, 2016. (DE 1.) On April 21, 2017, Industria filed the currently operative pleading, its Amended Complaint. Industria's Amended Complaint asserts the following claims:

- o  false association, false advertising, and trade dress infringement under 15 U.S.C. § 1125(a) (Counts 1 through 4);
- o  copyright infringement under 17 U.S.C. § 501 (Counts 5 through 10);
- o  source misrepresentation under 15 U.S.C. § 1064 (Count 11);
- o  trademark cancellation and commercial name protection under the Inter-American Convention for Trade Mark and Commercial Protection (Counts 12 through 14); and
- o  unfair competition under New Jersey law (Counts 15 and 16).

(DE 31.) On May 19, 2017, Latinfood and Zuluaga filed an answer to Counts 5 through 10 of Industria's Amended Complaint and moved to dismiss the remainder of the Amended Complaint. (DE 36, 37.) On December 29, 2017, I issued an opinion denying the defendants' partial motion to dismiss. (DE 81.)

On January 29, 2018, Latinfood and Zuluaga filed their Third Amended Answer to the amended complaint, in which they asserted a counterclaim against Industria and third-party claim against Cordialsa for tortious interference with prospective economic advantage. (DE 89.) Industria and Cordialsa filed a motion to dismiss Latinfood and Zuluaga's counterclaim/third-party claim (DE 69, 77, 78, 92), which I denied in a written opinion on March 9, 2018 (DE 95). On March 23, 2018, Industria and Cordialsa filed their answer to the counterclaims. (DE 97.)

On October 10, 2022, each side filed a summary judgment motion. (DE 265, 268.) On November 23, 2022, the parties filed briefs in opposition to one another's summary judgment motions and cross-moved for attorney's fees. (DE 273, 274, 275.) On December 22, 2022, the parties filed reply briefs in support

of their respective motions. (DE 279, 280.) The parties' summary judgment
motions are fully briefed and ripe for decision.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might
affect the outcome of the suit under the governing law" and a dispute about a
material fact is genuine "if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not
preclude the Court from granting a motion for summary judgment. *See id.*

A party moving for summary judgment has the initial burden of showing
the basis for its motion and must demonstrate that there is an absence of a
genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323
(1986). "A party asserting that a fact [is not] genuinely disputed must support
the assertion by . . . citing to particular parts of materials in the record,
including depositions, documents . . ., affidavits or declarations, stipulations
(including those made for purposes of the motion only), admissions,
interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). After the
moving party adequately supports its motion, the burden shifts to the
nonmoving party to "go beyond the pleadings and by her own affidavits, or by
the depositions, answers to interrogatories, and admissions on file, designate
specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S.
at 324 (internal quotation marks omitted). To withstand a properly supported
motion for summary judgment, the nonmoving party must identify specific
facts and affirmative evidence that contradict the moving party. *Anderson*, 477
U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not
significantly probative,' the court may grant summary judgment." *Messa v.
Omaha Prop. & Cas. Ins. Co.*, 122 F.Supp.2d 523, 528 (D.N.J. 2000) (quoting
*Anderson*, 477 U.S. at 249-50)). "If reasonable minds could differ as to the

import of the evidence," however, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250-51.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F. 3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In that respect, the Court's role in deciding a motion for summary judgment is simply "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

When, as here, the parties file cross-motions for summary judgment, the governing standard "does not change." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 401 (3d Cir. 2016) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (D.N.J. 2009); *Williams v. Philadelphia Housing Auth.*, 834 F. Supp. 794, 797 (E.D. Pa3), *aff'd*, 27 F.3d 560 (3d Cir. 1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted). While keeping in mind the independence of the motions, I have where practicable combined the discussion.

## III.  DISCUSSION: IAC Claims

I deal first with Industria's claims under the Inter American Convention for Trademark and Commercial Protection ("IAC"). These do not directly

concern damages for infringement, but instead relate to trademark registration and priority in the United States. Industria asserts claims of trademark cancellation pursuant to Articles 7 and 8 of the IAC (Count 12); and commercial name protection pursuant to Articles 16, 17, 18, and 31 of the IAC (Count 13).[10]

In Section III.A, I discuss Latinfood's[11] motion for summary judgment insofar as it asserts threshold, generally applicable grounds in opposition to the IAC claims. Then, in Section III.B, I discuss the dueling motions for summary judgment in relation to the specific requirements of the individual claims under the IAC.

## A. Latinfood's Motion for Summary Judgment with respect to the IAC Claims Generally

Latinfood asserts that it is entitled to summary judgment denying Industria's IAC claims on generally applicable, threshold grounds.

### 1. Territoriality doctrine

Latinfood asserts that the IAC claims are barred by the territoriality doctrine. "Under the territoriality doctrine, a trademark is recognized as having a separate existence in each sovereign territory in which it is registered or legally recognized as a mark." 4 McCarthy on Trademarks and Unfair Competition § 29:1 (4th ed. 2000) (citing *Person's Co. v. Christman*, 900 F.2d 1565, 14 (Fed. Cir. 1990)). "The concept of territoriality is basic to trademark law; trademark rights exist in each country solely according to that country's statutory scheme." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 714 (3d Cir. 2004) (quoting *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985)). "Thus, absent some use of its mark in the United States, a foreign mark holder generally may not assert priority rights

---

[10]    Industria also asserts a claim for trademark cancellation pursuant to Article 12 of the IAC (Count 14), but does not move for summary judgment on this claim.

[11]    In this legal discussion, the term "Latinfood" generally refers jointly to defendants Latinfood and Zuluaga, unless otherwise noted. "Latinfood" should also be understood to encompass its predecessor entity, HWZ.

under federal law, even if a United States competitor has knowingly appropriated that mark for his own use." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 156 (2d Cir. 2007) (citing *Person's*, 900 F.2d at 1569–70).

However, the territoriality doctrine is not absolute. *See Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1094 (9th Cir. 2004) (recognizing the "well-known marks" doctrine as an exception to the territoriality doctrine). And nations, while insisting on their sovereignty in most areas, may elect to relax their privileges in pursuit of some worthwhile policy. *See Person's*, 900 F.2d at 1569 n.16 (recognizing that Section 44 of the Lanham Act allows qualified foreign applicants to obtain a U.S. trademark registration without actual use of the mark in the U.S.). Here, the U.S. has purposely breached the territoriality principle by entering into mutual treaty obligations with certain foreign nations. The IAC is a self-executing treaty, having the force of law by virtue of its enactment. *See Bacardi Corp. of Am. v. Domenech*, 311 U.S. 150, 160–163 (1940). The IAC has thus been recognized as an exception to the territoriality principle. *See Brit.-Am. Tobacco Co. Ltd. & Tabacalera Ist Mens, S.A. v. Philip Morris Inc.*, 55 U.S.P.Q.2d 1585, 2000 WL 1005433, *5 (T.T.A.B. 2000).

I therefore will not grant summary judgment to Latinfood under the theory that the territoriality doctrine bars Industria's IAC claims.

### 2. Private Cause of Action

Latinfood asserts that the IAC does not create a private cause of action (Def. Mot. p. 35), despite my having previously rejected that legal argument in the opinion denying the motion to dismiss. (*See* MTD Op.) There, I reviewed numerous Articles of the IAC and found that their language "strongly supports a finding of intent to create a private cause of action." (*Id.* pp. 34–35.) Specifically, I relied on Articles 1, 7, 8, 12, 17, 18, 30, and 31, which I quoted. (*Id.* pp. 35–38.) I recognized that "the IAC manifests a specific intent to confer a private right of action on individuals." (*Id.* p. 38.)

The parties do not cite to any subsequent case law that would undermine or change that analysis, and the Court's research has uncovered none.

Latinfood's continued reliance on *Medellin v. Texas*, 552 U.S. 491 (2008), is unavailing because, as stated in my prior opinion, the language of the IAC is "sufficiently clear to overcome the general presumption stated in, e.g., *Medellin*." (MTD Op. p. 38.)

As I have already decided, then, the IAC provides a private cause of action.

### 3. Repression of Unfair Competition

Latinfood argues that Industria cannot maintain any claims under the IAC because such claims do not relate to the "repression of unfair competition" under Section 44(h) of the Lanham Act. (Def. Mot. pp. 41–42.) For support, Latinfood relies on *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116 (2d Cir. 2000) and *Empresa Cubana del Tabaco v. Culbro Corp.*, 213 F. Supp. 2d 247 (S.D.N.Y. 2002).

In *Havana Club,* a Cuban rum producer, Havana Club, brought an action against an American rum producer, Bacardi, alleging trademark infringement and false designation of origin. 203 F.3d at 119. The history of Havana Club's trademark rights was complicated by the nationalization of industries after the 1959 Cuban revolution and subsequent U.S. embargos on trade with Cuba. Post-revolution, the (now-state-owned) enterprise registered the Havana Club trademark with Cuban authorities in 1974 and with the United States in 1976. In 1997, Bacardi purchased the rights to the Havana Club trademark. Also in 1997, however, the United States revoked the Cuban state enterprise's registration.

Havana Club never sold rum under that name in the United States, but in 1995, Bacardi began to do so. In 1996, Havana Club filed an action in the U.S. to enjoin Bacardi from using the Havana Club trademark, alleging violations of Sections 32 and 43(a) of the Lanham Act and asserting rights to the Havana Club trade name under Sections 44(g) and 44(h) of the Lanham Act and Section III of the IAC.

14

The Second Circuit recognized that rights to trade names and commercial names protected by treaties may be brought under Section 44(b) and Section 44(g) of the Lanham Act. *Id.* at 126. Nevertheless, for different reasons, neither claim was permitted to go forward.

The Second Circuit held that, because the case involved a Cuban business, the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub.L. No. 105–277, § 211(b), 112 Stat. 2681 ("Omnibus Act"), applied. Section 211(b) of the Omnibus Act, barred the U.S. court from enforcing Havana Club's Section 44(b) trade name and commercial name rights under the IAC:

> (b) No U.S. court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national or its successor-in-interest under sections 44(b) or (e) of the Trademark Act of 1946 (15 U.S.C. 1126(b) or (e)) for a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of such mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented.

*Id.* at 127.

As to Havana Club's Section 44(h) claim, however, Omnibus Act Section 211(b) would not apply. The 44(h) claim nevertheless failed, for reasons relevant to the discussion here. The Second Circuit held that Section 44(h) of the Lanham Act only reaches provisions of the IAC that relate to "the repression of unfair competition." *Id.* at 134. One of Havana Club's Section 44(h) claims sought to apply Article 23 of the IAC, which concerns "Repression of False Indications of Geographical Origin or Source." The Court held that Havana Club could "not rely on this provision in asserting its section 44(h) claim, however, because the IAC does not treat rights under article 23 as rights related to the repression of unfair competition." *Id.* 135 n. 19.

*Empresa* similarly involved a Cuban company attempting to enforce its Cuban trademark against a United States company. 213 F. Supp. 2d at 251–

52. That Cuban plaintiff moved for partial summary judgment on its claims under Articles 7 and 8 of the IAC, which it asserted *via* Section 44(h) of the Lanham Act, as opposed to Section 44(g). *Id.* at 281. The court, citing *Havana Club*, recognized the requirement that the claims involve "rights related to the repression of unfair competition." *Id.* 280–81. Articles 7 and 8, however, are found in Chapter II of the IAC, titled "Trademark Protection," and are not "related to the repression of unfair competition." *Id.* at 281–82. Thus, the court acknowledged that Articles 7 and 8, even if they might have been enforceable under Section 44(g), are not enforceable under Section 44(h), the section under which the plaintiff brought its claims. *Id.* Therefore, the court dismissed the plaintiff's IAC claims. *Id.* at 282.

The holdings of *Havana* and *Empresa* do not foreclose Industria's claims under Articles 7 and 8 of the IAC. Both cases recognized that Articles 7 and 8 of the IAC are incorporated by Section 44(g) of the Lanham Act. There was no Section 44(g) claim in *Empresa,* and the 44(g) claims in *Havana* failed for reasons that do not apply here: specifically that, as claims by a Cuban entity, they were explicitly barred by Section 211(b) of the Omnibus Act. Indeed, Congress's explicit barring of such claims in the Omnibus Act implies that, but for the Omnibus Act, they would be viable under Articles 7 and 8 of the IAC. It follows that Industria (which is not a Cuban entity) may assert IAC claims, not under Section 44(h), but under 44(g).

Latinfood asserts the same argument in relation to Industria's claims under Articles 12, 16, 17, 18, and 31. Article 12 falls under the same chapter as Articles 7 and 8, Chapter II, "Trademark Protection," and is therefore validly incorporated by Section 44(g) of the Lanham Act. Similarly, Articles 16, 17, and 18 fall under Chapter III titled "Protection of Commercial Names," which falls under Section 44(g). Article 31 is simply a remedies provision.

I therefore will deny summary judgment to Latinfood on this ground.

16

### 4. Compliance with the Requirements of Domestic Law

Latinfood argues that Industria cannot maintain its IAC claims because it did not "compl[y] with the requirements established by the domestic legislation in such country and by this Convention." Industria, it says, failed to comply with domestic U.S. legislation because it did not use the mark in U.S. commerce or establish priority under Section 44(d) of the Lanham Act. (Def. Mot. pp. 40–41.)

I begin by addressing the meaning of the phrase "upon compliance with the requirements established by the domestic legislation in such country" in Article 7 (and the parallel requirements found in Articles 8, 17, and 18).[12] For the reasons that follow, I conclude that Industria is not required to satisfy Section 44(d) in order to be deemed in compliance with the requirements of U.S. law. "Congress enacted Section 44(d) of the Lanham Act to implement treaty rights regarding priority of foreign registrants," but Industria is not claiming priority rights in the U.S. pursuant to 44(d). *See Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 483 (2d Cir. 2005); (Pl. Reply p. 23.) Rather, Industria is applying for registration under Section 44(e) of the Lanham Act (*see* Kadosh Decl. Ex. 28), and that is sufficient to satisfy this requirement under Article 7 (and the parallel requirements found in Articles 8, 17, and 18), as established in the following case law.

In *Diaz v. Servicios de Franquicia Pardo's S.A.C.*, the applicant sought to register the mark Pardo's Chicken under Section 44(e) of the Lanham Act based on its Peruvian registration of that mark. 83 U.S.P.Q.2d 1320, 2007 WL 549241, *1 (T.T.A.B. 2007). The opposer argued that the application should be denied because the applicant's mark resembled the opposer's Pardo's Chicken

---

[12]  I discuss this requirement in relation to Article 7, a convenient exemplar. It applies equally to the other Articles on which Industria brings its claims. Article 8 includes the phrase "in accordance with the legal procedure of the country in which cancellation is sought"; Article 17 includes the phrase "in accordance with the law and the legal procedure of such countries"; and Article 18 includes the phrase "in accordance with the law and procedure of the country where the proceeding is brought."

mark, which it had used in U.S. commerce. The applicant asserted priority over the opposer's mark based on Article 7 of the IAC. *Id.* The opposer argued that the applicant could not sustain its Article 7 claim because Congress had incorporated the rights under Article 7 through Section 44 of the Lanham Act, and the applicant could not satisfy all of the requirements of Section 44. Thus, the argument ran, the applicant had failed to show "compliance with the requirements established by the domestic legislation in such country and by this Convention." *Id.* at \*3–\*4.

The Board disagreed with the opposer. It interpreted the final clause of Article 7 as merely requiring the filing of an application pursuant to *either* Section 44(d) *or* Section 44(e). *Id.* at \*6. The Board held that the applicant had satisfied the final clause of Article 7 because it had duly filed its application under Section 44(e) of the Lanham Act. *Id.* at \*12. The concern of the Board's analysis appears to be that the Article 7 petitioner not be held to a lesser standard than a claimant under domestic law as to the *particular* trademark claim that is being made.

The Court agrees that Section 44(d) does not independently limit the scope of IAC Article 7. As I recognized in my prior opinion, "international treaties, and Article 7 in particular, may grant rights broader than those granted by domestic law, including the Lanham Act. Contrariwise, Section 44(d) is not the only potentially applicable section of the Lanham Act." (MTD Op. p. 41.) A "treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed. . . . What is required is a clear expression by Congress of a purpose to override protection that a treaty would otherwise provide." *Havana Club*, 203 F.3d at 124. I find no clear expression of a purpose to confine protection to Section 44(d) and exclude protection under Section 44(e).

I will not grant Latinfood's motion for summary judgment on this basis, because I find no clear indication in the Lanham Act that Congress intended to limit the reach of Articles 7, 8, 17, or 18 to the requirements of Section 44(d).

In summary, I will deny Latinfood's motion for summary judgment insofar as it is based on these threshold grounds applicable to the IAC claims generally. I therefore move on to consider the merits of the IAC claims individually.

## B. Competing Motions for Summary Judgment with respect to Specific IAC Claims

Industria, now on the offensive, moves for summary judgment granting its claims under Articles 7, 8, 17, and 18 of the IAC. (Pl. Mot. p. 44.) In essence, Industria seeks (1) cancellation of Latinfood's Zenú mark under Articles 7, 8, 17, and 18 of the IAC; and (2) an injunction preventing Latinfood from using the marks and commercial names Zenú and Ranchera under Articles 17 and 18 of the IAC. (*Id.* pp. 44, 47.) Latinfood opposes Industria's motion on the merits and moves for summary judgment dismissing Industria's IAC claims under Articles 7, 8, 12, 16, 17, 18, and 31.

### 1. Article 7

I begin with Industria's claim under Article 7. On this claim, I must deny Industria's motion for summary judgment and grant that of Latinfood. Under Article 7, the sole remedy is to claim a preferential right or priority over the interfering mark.[13] Industria has clearly stated that its IAC claims are not

---

[13] Article 7 states, in full:

> Any owner of a mark protected in one of the Contracting States in accordance with its domestic law, who may know that some other person is using or applying to register or deposit an interfering mark in any other of the Contracting States, shall have the right to oppose such use, registration or deposit and shall have the right to employ all legal means, procedure or recourse provided in the country in which such interfering mark is being used or where its registration or deposit is being sought, and *upon proof that the person who is using such mark or applying to register or deposit it, had knowledge of the existence and continuous use in any of the Contracting States of the mark on which opposition is based upon goods of the same class, the opposer may claim for himself the preferential right to use such mark in the country where the opposition is made or priority to register or deposit it in such country*, upon compliance

based on a claim of priority rights in the U.S.[14] (*See* Pl. Op. pp. 34–35; Pl. Reply p. 23.) Since the sole remedy under Article 7 of the IAC is a claim to priority rights, and Industria is not seeking to assert a right to priority in the U.S., I must grant Latinfood's (and deny Industria's) motion for summary judgment on the Article 7 claim.

There is an alternative basis to deny Industria's motion and grant Latinfood's motion for summary judgment on the merits of the Article 7 claim. Because Latinfood has registered the Zenú mark in the U.S., Industria is barred from using Article 7 to gain priority over the Zenú mark for itself. As for the Ranchera mark, because Latinfood has no registration of that mark in the U.S., the registration bar does not apply. I discuss it for completeness.

As Latinfood notes, "the IAC does not allow for an assertion of priority against a mark registered in the U.S." (*See* Def. Mot. p. 33.) Because "Latinfood's Zenú mark is registered under Reg. No. 4402942," says Latinfood, it is entitled to summary judgment on Industria's claims under Article 7 of the IAC. (*Id.*; *see* Ingber Decl. Ex. E.)

Here, Latinfood relies primarily on a persuasive decision of the TTAB, *Lacteos De Honduras S.A.*, No. 91243095, 2020 WL 973178 (Feb. 28, 2020). In *Lacteos*, the applicant sought registration of its mark, RICA SULA, but the opposer opposed the registration based on priority and likelihood of confusion with its own U.S. trademark, SULA. *Id.* at *1. The applicant filed counterclaims under the IAC to cancel the opposer's U.S. trademark, claiming it had priority under Articles 7 and 8. *Id.* The Board concluded that a party may not seek priority under Article 7 if the allegedly interfering mark is already registered in the U.S.:

---

with the requirements established by the domestic legislation in such country and by this Convention.

IAC, ch. II, art. 7 (emphasis added).

[14] "Industria's claims under the IAC are not premised on having priority rights in the U.S., but on Defendants' misuse of Industria's marks to deceive and confuse consumers." (Pl. Op. pp. 34–35; repeated in Pl. Reply p. 23.)

> Article 7 of the [IAC] only provides a right to assert an affirmative defense when the interfering party's purported rights are based solely on use of the interfering mark. In view of the foregoing, we hold that the [IAC] does not articulate a right of priority over registered marks. . . . Accordingly, because Opposer's marks are registered in the U.S., Applicant cannot assert priority as an affirmative defense under Article 7 of the [IAC].

*Id.* at *10. *Compare Diaz*, 2007 WL 549241, at *3, *13 (Feb. 16, 2007) (granting summary judgment to applicant on Article 7 claim where opposer did not have a registered U.S. trademark and based its opposition only on use in the U.S.).[15]

Under *Lacteos*, because Latinfood has a registered U.S. trademark for Zenú, Industria cannot maintain a claim of priority with respect to its Zenú mark under Article 7 of the IAC. (*See* Ingber Decl. Ex. E); *Lacteos*, 2020 WL 973178, at *10.[16]

On these two alternative bases, I will grant summary judgment in favor of Latinfood on the Article 7 claim and deny Industria's competing motion.

## 2. Article 8

Article 8 grants the owner of a mark the "right to apply for and obtain the cancellation or annulment of the interfering mark." IAC, ch. II, art. 8. In order to establish a claim under Article 8 of the IAC, a person must show the following:

> (a) That he enjoyed legal protection for his mark in another of the Contracting States prior to the date of the application for the registration or deposit which he seeks to cancel; and

> (b) that the claimant of the interfering mark, the cancellation of which is sought, had knowledge of the use, employment, registration or deposit in any of the Contracting States of the mark for the specific goods to which said interfering mark is applied,

---

[15] The Board also recognized that priority is not a defense under Article 8. *Lacteos*, 2020 WL 973178 at *10.

[16] Latinfood also asserts this registration bar as a defense to Industria's claims under Articles 8, 12, 16, 17, 18, and 31. (Def. Mot p. 33.) I do not find any support for applying the *Lacteos* holding regarding priority under Article 7 to Industria's other IAC claims.

prior to adoption and use thereof or prior to the filing of the application or deposit of the mark which is sought to be cancelled;

Or

(c) that the owner of the mark who seeks cancellation based on a prior right to the ownership and use of such mark, has traded or trades with or in the country in which cancellation is sought, and that goods designated by his mark have circulated and circulate in said country from a date prior to the filing of the application for registration or deposit for the mark, the cancellation which is claimed, or prior to the adoption and use of the same.

IAC, ch. II, art. 8.

Industria cannot satisfy subsection 8(c), and therefore must go the 8(a)/(b) route. Industria argues that it has shown (a) that it enjoyed legal protection for the Zenú and Ranchera marks in Colombia prior to the date of Latinfood's application for the registration or deposit which Industria seeks to cancel; and (b) that Latinfood had knowledge of Industria's use of the Zenú and Ranchera marks in Colombia for the specific goods to which said interfering mark is applied.

Latinfood argues that it, not Industria, is entitled to summary judgment because Industria has "failed to proffer any certificate of registration documents either in its pleadings or through discovery demonstrating its alleged ownership of any relevant, current Colombian registrations"; "failed to prove that [] Latinfood had prior knowledge of Industria's alleged Colombian Registrations"; and "has produced no evidence that its goods under its alleged Colombian Zenú and Ranchera Registrations are the same as those set forth in Latinfood's registration." (Def. Mot. pp. 36–38.)[17]

---

[17] Both sides discuss Article 8 in relation to both the Zenú and Ranchera marks. As to the Ranchera mark, however, this claim would appear to have no application. The sole remedy under Article 8 is the "right to apply for and obtain the cancellation or annulment of the interfering mark." IAC, ch. II, art. 8. Latinfood does not possess a registered U.S. Ranchera mark, so there is nothing to cancel or annul. As to the Ranchera mark, then, I will grant summary judgment to Latinfood on Industria's Article 8 claim. The remainder of the discussion in this subsection concerns the Zenú mark.

As to subsection 8(a), Industria submits evidence that it has enjoyed legal protection for the Zenú mark prior to the date on which Latinfood applied for its use of that mark in the United States. Documents from the Superintendency of Industry and Trade of Colombia show that Industria's Zenú trademark has been registered in Colombia since at least May 7, 2001. (*See* Salazar Decl. Ex. M p. 1; Pl. St. ¶ 12.) Latinfood applied for its Zenú trademark in the U.S. nearly two years later, on January 25, 2013. (Kadosh Decl. Ex. 4). On the basis of these proofs, summary judgment must be awarded to Industria on this factual issue, subject to the reservation in the footnote below.[18]

As to subsection 8(b), the evidence is overwhelming and one-sided that Latinfood had knowledge of Industria's Zenú mark when it applied for its own Zenú mark in the U.S. To begin with, the inference that Latinfood simply copied Industria's product labels (and therefore had knowledge of them) is virtually inescapable. The two are practically identical. (*See* Section IV.C.3.b.i., *infra;* Ex. A, attached.) As I recognized in my prior opinion, "a side-by-side comparison argues against the possibility of coincidence." (MTD Op. p. 39.) No

---

[18]    Latinfood notes that the copies of Industria's registration documents are not properly authenticated as foreign records. Latinfood does not appear to otherwise dispute their authenticity or the fact of registration in Colombia. Specifically, Industria has submitted evidence that its Zenú and Ranchera marks are registered and protected in Colombia. (*See* Pl. St. ¶¶ 10–13; Def. Resp. ¶¶ 10–13; Salazar Decl. Exs. H–M.) The documents on which Industria relies are reports from the Superintendency of Industry and Commerce of Colombia. Latinfood asserts that those documents are not sufficient because "Industria has not produced a certified Certificate of Colombian Registration." (*See* Def. Resp. ¶¶ 10–13.) I will treat Industria's proffer as a representation that such evidence of foreign registration could be produced at trial in admissible, authenticated form. *See generally Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238-39 (3d Cir. 2016) (considering hearsay statements attributed to declarant who could be used as witness). I therefore will not grant Latinfood summary judgment based on this defect. Out of caution, however, I will stay my ruling and require that Industria make a sufficient showing of authenticity of these documents before granting it judgment on this issue, which is also relevant to other claims. *See* Sections III.B.2 & III.B.4., *infra.*

    In accordance with the accompanying Order, Industria is granted 30 days from the date of this decision to either provide appropriate authentication of its registration of the Zenú mark in Colombia or otherwise establish the authenticity of registration. Within 14 days thereafter, Latinfood may submit any opposition

plausible explanation for this convergence, aside from purposeful copying, has emerged in discovery.[19]

Indeed, further evidence of copying has emerged. Mr. Zuluaga instructed a marketing assistant at Cibao to look at Industria's website when creating Latinfood's packaging designs. (Pl. St. ¶¶ 46–53; Def. St. ¶¶ 46–53; Def. Supp. St. ¶ 20; Pl. Supp. Resp. ¶ 20.) It cannot be a coincidence that those designs turned out to almost precisely duplicate those of Industria.[20]

Additionally, Latinfood's 2013 application to register the Zenú trademark attached actual photos of *Industria'*s products as exemplars of *Latinfood'*s proposed mark. (Pl. St. ¶ 33; Def. Resp. ¶ 33; *see* Kadosh Decl. Ex. 4.) Mr. Zuluaga asserts that he sent his own versions for inclusion in the application, but USTM inexplicably submitted the application with Industria's exemplars. No explanation is offered. No relevant testimony from USTM is offered. Nor does Mr. Zuluaga proffer copies of the exemplars he claims he sent, or even explain how they supposedly differed from Industria's.

There is more. Mr. Zuluaga then received a request from the USPTO for "pictures of the products on the shelf / at the point of sale." (*See* Kadosh Op. Decl. Ex. 46; *see also* See Pl. St. ¶ 33; Def. Resp. ¶ 33; Ingber Op. Decl. Exs. 4–5.) In response to that request, on May 14, 2013, Mr. Zuluaga emailed USTM two additional pictures to use in connection with Zenú application. The images attached to that email are clearly of Industria's products: one of the images shows a product label bearing Industria's website address, www.zenu.com.co; the other image includes Industria's Ranchera trade dress, depicting a family around a campfire, a label which Latinfood does not claim to have used. (*See* Kadosh Op. Decl. Ex. 46.) At his deposition, Mr. Zuluaga was confronted with

---

[19]    Attached to this Opinion as Exhibits A and B are examples of Industria's and Latinfood's labeled Zenú and Ranchera products. The court notes Latinfood's position that it has not used these Ranchera marks "for years pursuant to a Stipulation executed by the parties." (*See* Def. Resp. ¶ 68.)

[20]    Mr. Zuluaga actually brought one of Industria's Ranchera labels to Ms. Isidor's office. (Pl. St. ¶ 57; Def. Resp. ¶ 57.)

the email and images, and testified that he did not send those images to USTM. (Kadosh Decl. Ex. 43 Zuluaga Tr. 276:17–278:16.) Latinfood provides a copy of this relevant email, but again fails to provide a copy or even a description of the "accurate pictures" that Mr. Zuluaga supposedly sent. (*See id.* Tr. 277:24–278:2; Ingber Op. Decl. Ex. 5.) Latinfood simply posits, without elaboration, a further mystery: that "USTM unilaterally responded to the [USPTO] with incorrect specimens." (Def. Op. p. 32.)

This evidence is overwhelming; Mr. Zuluaga's denials are conclusory and factually deficient. His bare, fact-free denials are not sufficient to withstand summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011) (holding that "self-serving deposition testimony is insufficient to raise a genuine issue of material fact").

And all of the above, moreover, ignores the fact that USTM acted as an agent for Latinfood, and Mr. Zuluaga *himself* signed off on the registration application as submitted. *See Covington v. Int'l Ass'n of Approved Basketball Offs.*, 710 F.3d 114, 120 (3d Cir. 2013) ("An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent."); *Dobkin v. Enter. Fin. Grp., Inc.*, No. 14-cv-01989, 2014 WL 4354070, at *4 (D.N.J. Sept. 3, 2014) (finding an agency relationship was created through an outsourcing arrangement in which one defendant had been given the authority to sell the other defendant's products). Latinfood cannot shirk responsibility by simply stating that Mr. Zuluaga was unaware of the contents of the application he signed.[21]

---

[21] The record also includes emails and deposition testimony stating that Mr. Zuluaga intentionally copied Zenú's packaging for his own products. (*See* Kadosh Decl. Exs. 13, 37.)

Therefore, as to knowledge of the mark, there is no triable issue for Latinfood.

As Latinfood correctly points out, Section 8(b) requires that the opposer have knowledge, not just of the mark itself, but of its use for the "specific goods" to which the opposer's interfering mark is applied. *Lacteos*, 2020 WL 973178, at *8. The TTAB has interpreted "specific goods" to mean "the same goods." *Id.* I find that this "same goods" requirement, too, is met.

True, in *Lacteos*, the applicant had a registered mark in a foreign country for "plantain chips, tortilla chips, potato chips, cheese curls, and/or cheese balls" and the opposer had applied to register for "spreads, namely, vegetable oil and dairy cream based blends." *Id.* at *7–*8. The TTAB compared those products and concluded that they were not the "same goods" under subsection 8(b).

This case, however, is not comparable to *Lacteos*. Here, Industria provides evidence that it has a registered Colombian trademark for Zenú for Class 29 goods, described as "meat, fish, poultry and game; meat extracts; preserved, dried and cooked fruits and vegetables; jellies, jams, compotes; eggs, milk and milk products; edible oils and fats"; and a registered trademark for Ranchera for Class 29 goods, described as "meat, fish, poultry and game meat; meat extracts; preserved, frozen, dried and cooked fruits and vegetables; jellies, jams, compotes; eggs, milk and milk products; edible oils and fats." (*See* Pl. St. ¶¶ 12–13; Def. St. ¶¶ 12–13; Salazar Decl. Exs. K, M pp. 1, 19.) Latinfood's registration is likewise for Class 29 goods, described as "bologna; canned cooked meat; canned fish; chorizo; hot dogs; preserved meats and sausages; processed meat; sausages; tuna fish." (Ingber Decl. Ex. E.)

Latinfood's argument appears to be that the two lists do not precisely correspond, item-for-item. That is too narrow of a reading of *Lacteos*. In *Lacteos*, the products were entirely separate: chips vs. dips. Here, the lists of Industria's and Latinfood's products track very substantially. Latinfood's registration covers various meat and fish products, which would fall within the

plain meaning of "meat, fish, poultry and game" covered by Industria's registration. I find that the "same goods" requirement is met as a matter of law.

All of the requirements of Article 8 are therefore fulfilled here. Industria's evidence is highly persuasive, and Latinfood's opposing evidence and legal arguments do not suffice to raise a triable issue of fact. Accordingly, Industria's motion for summary judgment on its Article 8 claim is granted as to the Zenú mark, and Latinfood's corresponding motion is denied.

One reservation: I will, however, temporarily stay the effect of my order here for the reasons expressed above. *See* p. 23 n.18, *supra*.

### 3. Article 17

To prove a claim under Article 17 of the IAC, Industria must show that (1) it is a "manufacturer, industrialist, merchant or agriculturalist domiciled or established in any of the Contracting States"; (2) it has acted in accordance with U.S. law and legal procedure; (3) Latinfood's interfering products are of the "same class" as those sold under Industria's commercial name; (4) Industria's commercial name was "legally adopted and previously in use"; and (5) Industria believes that Latinfood's interfering mark "may lead to error or confusion in the mind of the consumer" with respect to Industria's commercial name. IAC, ch. III, art. 17.[22]

The first factor is satisfied because there is no genuine dispute that Industria "is a Colombian company that produces and distributes food products, which has been in operation for [o]ver 60 years." (Pl. St. ¶ 1; Def.

---

[22]     Article 17 states, in full:

   Any manufacturer, industrialist, merchant or agriculturist domiciled or
   established in any of the Contracting States, may, in accordance with the
   law and the legal procedure of such countries, oppose the adoption, use,
   registration or deposit of a trade mark for products or merchandise of the
   same class as those sold under his commercial name, when he believes
   that such trade mark or the inclusion in it of the trade or commercial
   name or a simulation thereof may lead to error or confusion in the mind
   of the consumer with respect to such commercial name legally adopted
   and previously in use.

IAC, ch. III, art. 17.

Resp. ¶ 1.) The second factor is satisfied because Industria filed an application for U.S. registration of its Zenú and Ranchera marks under Section 44(e) of the Lanham Act.[23] (Pl. St. ¶¶ 116–117; Def. Resp. ¶¶ 116–117; Def. St. ¶¶ 21–22; Pl. Resp. ¶¶ 21–22; Kadosh Decl. Ex. 28.) As to the third factor, as previously discussed, Latinfood's Zenú and Ranchera products include various meat and fish products, which would fall within the plain meaning of the term "meat, fish, poultry and game" covered under Industria's registrations. (*See* Ingber Decl. Ex. E; Salazar Decl. Exs. K, M.) Therefore, there is no genuine dispute that Latinfood's and Industria's products are in the "same class."

As to the fourth factor, "Zenú-marked goods have been sold in Colombia 'for more than 60 years'" and "Ranchera-marked goods have been sold in Colombia for 'over 30 years.'" (Pl. St. ¶¶ 3, 6; Def. Resp. ¶¶ 3, 6.) Latinfood asserts that it has used the Zenú name in commerce since 2011. (Def. St. ¶ 16.) Even accepting that date as accurate (Industria disputes it), the dispute is not consequential, because Industria used the Zenú name in commerce prior to 2011.[24] (*See* Pl. St. ¶¶ 3, 6; Def. Resp. ¶¶ 3, 6.)

As to the fourth factor, there is a dispute regarding the proper authentication of Industria's Colombian registration documents. I have already

---

[23] Industria filed its 44(e) application for the Ranchera mark in November 2016. Industria's 44(e) application for the Zenú mark, filed in November 2014, was suspended on the basis that a "civil proceeding [in connection with Industria's Petition for Cancellation] pertains to an issue that could directly affect whether applicant's mark can be registered." (Pl. St. ¶¶ 116–17; Def. Resp. ¶¶ 116–17; Def. St. ¶ 21; Pl. Resp. ¶ 21.) Industria's Ranchera application and petition for cancellation of Latinfood's Zenú mark were both stayed pending disposition of this case. (Pl. St. ¶ 116; Def. Resp. ¶ 116; Def. St. ¶ 22; Pl. Resp. ¶ 22.)

Additionally, I note that another U.S. company (unrelated to this action) filed an opposition to Industria's application to register its Ranchera mark, asserting a likelihood of confusion with respect to its U.S.-registered "Ranchero" mark. (Def. St. ¶ 22; Pl. Resp. ¶ 22.) That matter has also been stayed pending disposition of this case. (*Id.*) That dispute does not affect my analysis because, at this time, Industria's application to register its Ranchera mark has not been denied.

[24] As discussed in Section IV.E.2., *infra*, there is actually no evidence in the record that Latinfood used the Zenú mark in commerce in 2011. I assume it here, but only for purposes of argument.

granted Industria the opportunity to remedy that defect if it can. *See* p. 23 n.18, *supra*; p. 27, *supra*.

There is also, however, an open issue of fact regarding the fifth factor: whether Industria has shown that Latinfood's marks "may lead to error or confusion in the mind of the consumer" with respect to Industria's commercial name. As to that issue, the evidence points both ways and must be resolved by the finder of fact. *See* discussion of likelihood of confusion, Section IV.C.3.b., *infra*.

I will therefore deny both sides' motions for summary judgment on the Article 17 claim.

### 4. Article 18

Article 18 grants the right to "apply for and obtain an injunction against the use of any commercial name or the cancellation of the registration or deposit of any trade mark." IAC, ch. III, art. 18. To prove a claim under Article 18 of the IAC, Industria must show that: (1) it is a "manufacturer, industrialist, merchant or agriculturalist domiciled or established in any of the Contracting States"; (2) it has acted in accordance with U.S. law and procedure; (3) Latinfood's interfering name or trademark is "identical with or deceptively similar to" Industria's commercial name "already legally adopted and previously used in [Colombia] in the manufacture, sale or production of articles of the same class"; and (4) prior to Latinfood's use or adoption of the name or mark, Industria used and continues to use the "commercial name adopted and previously used" for the "same products" in Colombia. IAC, ch. III, art. 18.

As discussed above, there is no genuine dispute that Industria is a "manufacturer, industrialist, merchant or agriculturalist domiciled or established in any of the Contracting States"; that it has acted in accordance with U.S. law and procedure; that it previously used, and continues to use, the Zenú and Ranchera marks in Colombia for the "same products"; or that Latinfood's Zenú and Ranchera names are identical to Industria's Zenú and Ranchera names.

Once again, I note the facially adequate records of the registration of the Zenú and Ranchera marks in Colombia, note Latinfood's objection to the authentication of such records, and stay my ruling pending proper authentication. *See* p. 23 n.18, *supra*; p. 27, *supra*.

On the Article 18 claim, then, Latinfood's summary judgment motion is denied, and Industria's motion is conditionally granted.

*   *   *

The result of the foregoing analysis, then, is that Latinfood's Zenú mark is canceled based on Industria's treaty rights under Articles 8 and 18 of the IAC, and Latinfood is enjoined from using the Zenú and Ranchera marks based on Industria's treaty rights under Article 18. Both rulings, however, are stayed, conditional upon a showing of proper authentication of the Colombian records within 30 days. I next consider Industria's claims under U.S. domestic law.

## IV. DISCUSSION: LANHAM ACT AND RELATED CLAIMS

### A. Statutory Standing under the Lanham Act

There is an issue common to all of the Lanham Act claims, as well as the parallel claims of unfair competition under the New Jersey Fair Trade Act, which the parties refer to as "statutory standing," although it is probably better viewed as a merits issue.[25]

---

[25] The use of the term "statutory standing" to describe the inquiry under the *Lexmark* test is not entirely accurate. Instead, the inquiry concerns whether a party "has a cause of action under the statute," a non-jurisdictional merits issue that requires application of "traditional principles of statutory interpretation." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387–88 (2014); *see Marathon Petroleum Corp. v. Sec'y of Fin. for Delaware*, 876 F.3d 481, 493 n.13 (3d Cir. 2017). The Third Circuit has elaborated thus:

> *Lexmark* clarified that . . . the zone-of-interests analysis is not a constitutional or prudential standing inquiry meant to ensure federal court jurisdiction but rather is a statutory question to be addressed on the merits. *See* [134 S. Ct.] at 1387 n.4 (indicating that "statutory standing" and "prudential standing" are not proper descriptions of the zone-of-interests analysis because "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case'"

30

Counts 1 through 4, which arise under Section 43 of the Lanham Act of 1946 (codified at 15 U.S.C. § 1125), allege (1) false association; (2) false advertising; and (3) trade dress infringement. Count 11, under Section 14 of the Lanham Act (codified at 15 U.S.C. § 1064), alleges source misrepresentation. Both parties move for summary judgment on these claims. "The elements of unfair competition under the New Jersey Fair Trade Act, N.J. Stat. Ann. § 56:4, are the same as those under Section 43(a) of the Lanham Act, saving the jurisdictional interstate commerce element." *Endo Pharm., Inc. v. Actavis, Inc.*, No. 12-CV-7591 (KM), 2016 WL 1090356, at *5 (D.N.J. Mar. 21, 2016) (citing *SK & F Co. v. Premo Pharm. Laboratories, Inc.*, 625 F.2d 1055, 1066 (3d Cir. 1980)). Accordingly, my ruling as to the Lanham Act claims equally applies to the claims of unfair competition under the New Jersey Fair Trade Act.

Latinfood asserts that Industria as plaintiff does not possess a statutory cause of action under the Lanham Act, and that therefore summary judgment must be granted in its favor on Counts 1 through 4 and 11. Latinfood previously moved to dismiss those claims under Rule 12(b)(6) for the same reason. I denied that motion to dismiss, concluding that Industria's allegations of statutory standing were sufficient. (MTD Op. pp. 25–26, 29, 32.) Latinfood now seeks to revisit this issue with the benefit of factual development. Industria responds that, on a summary judgment standard, the record establishes it has a cause of action under the Lanham Act. (Pl. Mot. pp. 34–37.)

---

(emphasis in original)); *see also Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 805 F.3d 98, 105 (3d Cir. 2015) (noting that "[t]he Court clarified [in *Lexmark*] that the zone-of-interests requirement goes to whether a particular plaintiff has a cause of action under a given law, not a plaintiff's standing" and "*Lexmark* strongly suggests that courts shouldn't link the zone-of-interests test to the doctrine of standing").

*Id.* Although "statutory standing" is not a precise fit, it is the terminology used by the parties in their briefing, and for convenience I adopt it for purposes of this discussion. For present purposes, little turns on the distinction.

The purpose of the Lanham Act is to "protect persons engaged in such commerce against unfair competition."15 U.S.C. § 1127; *see also POM Wonderful LLC v. Coca-Cola Co.*, 134 S. Ct. 2228, 2234 (2014). In *Lexmark International, Inc. v. Static Control Components*, the Supreme Court set forth a two-prong test to determine whether a plaintiff has a statutory cause of action to sue under Section 43(a) of the Lanham Act. The critical inquiry is whether the plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue under § [43(a)]." 134 S. Ct. 1377, 1388 (2014).

Specifically, *Lexmark* held that "to come within the zone of interests in a suit for false advertising under § [43(a) of the Lanham Act], a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 1390. The "zone of interest" test is not especially demanding, and the benefit of the doubt goes to the one alleging the cause of action. *Id.* at 1389. The Court further explained that, under proximate causation principles, "a plaintiff suing under [the Lanham Act] must [also] show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 1391.

### 1. Use of the Mark in the United States

Before applying the two-part *Lexmark* test to this action, I must address Latinfood's argument that Industria's cause of action lacks a necessary prerequisite because Industria has not used its foreign trademark in U.S. commerce.[26] I earlier addressed this argument at the motion to dismiss stage, and concluded that use of the mark in the U.S. was not a prerequisite to bringing Lanham Act claims:

---

[26]     Latinfood also asserts that Industria cannot succeed on its trademark infringement claims because Industria abandoned its U.S. trademark for Zenú and has no valid trademark rights in the U.S. (Def. Mot. pp. 13–15.) However, "the plain language of § 43(a) does not require that a plaintiff possess or have used a trademark in U.S. commerce as an element of the cause of action. Section 43(a) thus stands in sharp contrast to Lanham Act § 32, which is titled as and expressly addresses 'infringement.'" *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 706 (2016).

> At this preliminary stage, however, I cannot find that the false
> advertising and false association claims are ruled out as a matter
> of law because plaintiff has not pled use of the Zenú and Ranchera
> marks in the United States.

(MTD Op. pp. 25–26.) In that opinion, I noted that the Third Circuit had not
addressed the issue, but found the Fourth Circuit's analysis "persuasive, at
least for purposes of a motion to dismiss." (*Id.* p. 25.)

The parties dispute whether that prior holding is "law of the case." (*See*
Pl. Op. pp. 3–4; Def. Reply pp. 3–4.) The case law was concededly thin six years
ago, when I rendered that opinion under a motion to dismiss standard. I will
therefore reexamine the matter, taking into consideration any relevant cases
decided in the interim.

Today, the Third Circuit still has not addressed the question of whether a
foreign trademark holder who has never used the trademark in U.S. commerce
is a person entitled to maintain a cause of action under the Lanham Act. One
case answering that question in the affirmative, *Belmora LLC v. Bayer
Consumer Care AG*, 819 F.3d 697 (4th Cir. 2016), which I cited in my earlier
opinion, remains good law. The out-of-circuit case law remains scant.

What is new is a decision by the Federal Circuit in *Meenaxi Enterprise,
Inc. v. Coca-Cola Company*, 38 F.4th 1067 (Fed. Cir. 2022). In *Meenaxi*, Coca-
Cola owned foreign marks for Thums Up cola and Limca lemon-lime soda, and
distributed those products in foreign markets such as India. *Id.* at 1069.
Meenaxi, however, was the first to register marks for Thums Up and Limca in
the U.S., and was the first to distribute those products in the U.S. *Id.* at 1070.
Meenaxi's U.S. logos and slogan were nearly identical to those used by Coca-
Cola abroad. Coca-Cola sought to cancel Meenaxi's U.S. registration under
Section 14(3) of the Lanham Act, asserting that Meenaxi had misrepresented

the source of its goods. *Id.* at 1069. The Trademark Trial and Appeals Board ("TTAB") found in Coca-Cola's favor, and Meenaxi appealed. *Id.*[27]

The Federal Circuit focused on whether, under *Lexmark,* Coca-Cola as plaintiff possessed a statutory cause of action to challenge Meenaxi's trademark registrations. Meenaxi argued that Coca-Cola's claim was barred by the territoriality principle, which recognizes that a trademark has a "separate existence in each sovereign territory in which it is registered or legally recognized as a mark." *Id.* at 1073. As that court perceived, however, Coca-Cola did not claim any U.S. trademark rights in Thums Up or Limca; rather, Coca-Cola's claim was based on *injury* allegedly occurring in the U.S. *Id.* at 1074–75. Accordingly, the Federal Circuit moved on to the *Lexmark* test and looked to whether Coca-Cola alleged an injury to sales or reputation.

As for injury to sales, Coca-Cola failed to identify any lost sales in the United States. Although Coca-Cola presented statements regarding "future plans" to market Thums Up and Limca in the United States, the Federal Circuit held that "nebulous future plans for U.S. sales cannot be the basis for a Lanham Act claim." *Id.* at 1076. The Federal Circuit cited case law requiring at least "concrete plans for future activity" to support a claim of sales harm. *Id.*

As for reputational harm, Coca-Cola proffered two considerations: "(1) members of the Indian-American community in the United States were aware of the THUMS UP and LIMCA marks and (2) Meenaxi traded on Coca-Cola's goodwill with Indian-American consumers in those marks by misleading them into thinking that Meenaxi's beverages were the same as those sold by Coca-Cola in India." *Id.* at 1076–77. The Federal Circuit disagreed, finding that Coca-Cola had not produced substantial evidence that the Indian-American community was aware of the marks. *Id.* at 1077. The TTAB's findings, the Court noted, had related to Coca-Cola's reputation in India, not in the U.S. *Id.*

---

[27] Although *Meenaxi* involved only Section 14(3) of the Lanham Act, the language of Section 14(3) is very similar to that of 43(a), and the two statutes have the same requirements as to injury. *Id.* at 1072–73.

at 1077–78. Additionally, the Federal Circuit recognized that the mere copying of a foreign mark does not in itself establish reputation in the U.S. *Id.* at 1078.

In sum, because Coca-Cola failed to establish lost sales or an injury to its reputation, it could not satisfy the *Lexmark* test. *Id.* at 1079.

The intervening authority of *Meenaxi,* while suggestive, does not alter this Court's prior analysis. As before, Latinfood argues that use of the mark in the United States is a prerequisite to Lanham Act statutory standing. As before, the Court finds that there is no such rigid prerequisite. Indeed, *Meenaxi* itself suggests that there are multiple alternative bases, although those bases were not established factually in that case. As before, then, I reject Latinfood's contention that Industria lacks a statutory cause of action under the Lanham Act simply by virtue of the fact that it did not exploit its Zenú and Ranchera marks in the United States.[28] What is required is satisfaction of the *Lexmark* test of injury, to which I turn.

## 2. *Lexmark* test of injury

Moving to the *Lexmark* test of injury, I find two genuine, disputed issues of material fact: (1) whether Industria had concrete plans to enter the United States market; and (2) whether Industria's commercial injury was proximately caused by Latinfood's actions.

Industria claims that it has suffered commercial harm because it had moved forward with sufficiently concrete plans to bring "Zenú branded products into the United States in 2014." (Pl. Mot. p. 13.) Hernando Ramos Moreno, Industria's director of sales, testified at his deposition that he met with Luis Arango, Cordialsa's managing director, in March 2014 to discuss "expand[ing] Cordialsa's sales with the Industria portfolio in the United States." (Kadosh Decl. Ex. 45 Ramos Tr. 38:5-17.) From March to June 2014, Industria's representatives exchanged emails on the topic of importing Zenú

---

[28] Latinfood also argues that Industria cannot rely on the "famous" or "well-known" marks doctrine to oppose Latinfood's U.S. trademark. (Def. Mot. p. 12.) Industria responds that it is not claiming protection under the well-known marks doctrine. (Pl. Op. pp. 15 n. 5, 18 n. 9.) Therefore, I do not address this argument.

products to the U.S. (*See* Pl. St. ¶¶ 91–104; Def. Resp. ¶¶ 91–104; Salazar Decl. Ex. CC.) Among those emails were communications with ProExport, a "Colombian government entity [which] promote[s] the export [of goods] from Colombia" and communications discussing sending samples of Industria's beans to the U.S. Food and Drug Administration ("FDA") and validating its use of the Zenú trademark in the U.S. (*See* Pl. St. ¶¶ 103, 106; Def. Resp. ¶¶ 103, 106; Salazar Decl. Exs. CC, GG.)

To be sure, there is evidence pointing the other way. For example, in May 2014, Mr. Arango emailed ProExport stating: "I would like to see if proexport could give us some advice with some products that I have always wanted to import, but have heard could not be brought to the USA because of US government restrictions. Specifically, they are some Zenú products. Do you think we could go over this with proexport to see if this kind of product can be brought to the US and what the restrictions or duties would be under the [FDA]?" (Salazar Decl. Ex. MM.) In June 2014, Industria's head of marketing emailed Mr. Ramos stating: "Regarding the possibility of exporting frozen products, this has not yet been explored due to the current logistical barriers and the fact that we still have a great deal of work to do to penetrate the local market[.]" (Salazar Decl. Ex. DD.) As late as February 2022, in response to a consumer's inquiry regarding importing Industria's Zenú products to the U.S., Industria's advertising agency manager responded that the company was unable to import certain foods because of government restrictions. (Salazar Decl. Ex. UU.)

Industria's evidence, then, is far from ironclad, but there is enough here to raise a factual issue as to whether Industria had sufficiently concrete plans to enter the U.S. market in 2014.[29] Neither side's motion for summary judgment can be granted on this issue.

---

[29] I note that, as to reputational injury, which is an alternative basis for satisfying the first prong of the *Lexmark* test, Industria's evidence is insufficient. Industria makes the conclusory assertion that Latinfood has exerted control over the reputation of Industria's products and has cost Industria the ability to control its reputation in

As to the second prong of the *Lexmark* test, Industria must show that its injury, construed narrowly as its inability to enter the U.S. market, was proximately caused by Latinfood. Generally, the determination of proximate causation is "left to the jury for its factual determination." *Thabault v. Chait*, 541 F.3d 512, 523 (3d Cir. 2008); *see also Jakelsky v. Friehling*, 33 F. Supp. 2d 359, 365 (D.N.J. 1999); *Cruz–Mendez v. ISU/Ins. Servs. of San Francisco*, 722 A.2d 515, 525 (N.J. 1999)). In many cases, a jury must resolve "a factual dispute as to the events and circumstances which caused injuries." *Melone v. Jersey Cent. Power & Light Co.*, 113 A.2d 13, 20 (N.J. 1955)). The issue of proximate cause can be addressed, as a matter of law, "only where the outcome is clear or when highly extraordinary events or conduct takes place." *Thabault*, 541 F.3d at 524.

Industria asserts that its plans to enter the U.S. market in 2014 "came to a halt when it discovered that Latinfood was impermissibly expropriating its marks and trade dress" because "[e]ntering the U.S. market now while the rights to its marks are still undetermined would not only subject Industria to potential infringement litigation by Latinfood, but additionally, Industria would enter into a marketplace competing against its own brand names, only adding to consumer confusion, while defendants would continue to exert control over the reputation of Industria's products." (Pl. Mot. pp. 35–36.) This evidence may suggest a plausible causal connection, but there is also evidence that Industria could not enter the U.S. market because of certain government restrictions on the importation of food. (*See supra*, discussing Salazar Decl. Exs. DD, MM, UU.) Therefore, I conclude that there is a genuine dispute of material fact regarding proximate causation.

---

the U.S. (*See* Pl. Mot. p. 36.) However, Industria has not provided any evidence describing its U.S. reputation or even shown that it has any particular reputation in the U.S. to be harmed.

The issues of material fact concerning injury and proximate causation bar an award of summary judgment to either party regarding Industria's statutory standing (as we have used that terminology) under *Lexmark*.

These so-called standing issues, common to the Lanham Act claims, may tend to blend with other merits issues when they are submitted to the finder of fact. *See Marathon Petroleum Corp.*, 876 F.3d at 493 n.13. I therefore move on from the common issues, and consider the claims individually on a summary judgment standard.

## B. False Advertising

Both sides move for summary judgment on Industria's claim of false advertising.

"To establish a false advertising claim under the Lanham Act, a plaintiff must prove: 1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011) (quoting *Warner–Lambert v. Breathasure*, 204 F.3d 87, 91–92 (3d Cir. 2000)).

Latinfood argues that it is entitled to summary judgment on Industria's false advertising claim because Industria must, but cannot, show that the "public was actually deceived in order to recover damages under [Section] 43(a) of the Lanham Act." (Def. Mot. p. 18 (quoting *Seale v. Gramercy Pictures*, 964 F. Supp. 918 (E.D. Pa. 1997).) Additionally, according to Latinfood, Industria fails to provide any evidence that Latinfood's false labeling caused it harm in the U.S., and Industria's lack of advertising in the U.S. precludes "the necessary mental association between the mark and the product" in the mind of the U.S.

consumer (*Id.* p. 20.) As a result, Latinfood asserts, Industria has not suffered actual damages. (*Id.* p. 21.)[30]

Industria responds to Latinfood's arguments and moves for summary judgment on its own behalf. Industria asserts that actual deception can be presumed because Latinfood made the following literally false statements: (1) Latinfood was the exclusive distributor of Industria's Zenú products in the U.S.; (2) Latinfood's Zenú products came from Colombia; and (3) Latinfood's website declared, "We have products from" with Industria's Zenú logo, among others, underneath. (Pl. Op. p. 25.) Industria also argues that it has provided evidence that customers were deceived, relying on communications with Gloria Moreno (a distributor who worked with Latinfood) and a conversation on Twitter between an alleged customer and Paola Vasquez, Industria's advertising agency manager, discussed below. (Pl. Op. p. 25; *see* Salazar Decl. Exs. SS, UU.) Additionally, Industria asserts that it has shown a likelihood of injury because Latinfood's statements caused Industria a loss of goodwill. (Pl. Op. pp. 26–27.)

"To evaluate a claim of false advertising under Section 43(a) of the Lanham Act, the Court must determine which of the accused party's statements are actionable." *Newborn Bros. Co. v. Albion Eng'g Co.*, 481 F. Supp. 3d 312, 344 (D.N.J. 2020). Industria identifies three statements as literally false. First, on September 26, 2014, the U.S. Small Business Administration ("SBA") published an article stating that Zuluaga "convinced a major product manufacturer in Colombia to sign an exclusive distribution and importing rights agreement for the tri-state area." (*See* Kadosh Decl. Ex. 25; Pl. St. ¶ 82; Def. Resp. ¶ 82.) Second, Mr. Zuluaga told a supermarket sales associate that he had Colombian products. (*See* Kadosh Decl. Ex. 42 Perez Tr. 19:12–14; Pl. St. ¶ 77; Def. Resp. ¶ 77.) Third, on October 4, 2016, Latinfood's website stated

---

[30]     Latinfood's other reasons for dismissal of the false advertising claim repeat its arguments related to Industria's "statutory standing" under *Lexmark*, discussed above. (*See* Def. Mot. pp. 17–23.) I do not repeat that discussion here.

in substance that it offered Industria's Zenú products. (*See* Kadosh Decl. Ex. 22, Ex. 43 Zuluaga Tr. 182:14–183:25.)

As to the first and second statements, Industria fails to show literal falsity. Industria speculates that the September 2014 SBA article must have been based on an email Zuluaga sent in August 2014 to a prospective IT consultant stating that he had "the contract for the exclusive distribution of ZENÚ in the US." (*See* Kadosh Decl. Ex. 26; Pl. St. ¶ 83; Def. Resp. ¶ 83.) However, no evidentiary connection is drawn between the email and the September 2014 article. And as to the statement to the supermarket sales associate, Industria offers no more than an assumption that Zuluaga's reference to Colombian products meant Industria's products. For his own part, the sales associate testified that Mr. Zuluaga did not mention the names of the Colombian products and that he did not know where Mr. Zuluaga's products were made. (Kadosh Decl. Ex. 42 Perez Tr. 19:12–25, 28:24–29:23.) In both instances, the connection to Industria is too tenuous to meet the high standard of literal falsity.

The third statement, however, would meet the test of literal falsity, because Latinfood did not at any time distribute Industria's Zenú products. Indeed, Latinfood elsewhere insists that Industria's Zenú products have never been sold in the U.S. at all, by anyone. (Def. St. ¶5; Pl. Resp. ¶ 5.) As to this statement, then, Industria can satisfy the first element of a false advertising claim.

"As to the second element, actual deception or a tendency to deceive is presumed if a plaintiff proves that an advertisement is unambiguous and literally false." *Pernod*, 653 F.3d at 248 (citing *Novartis*, 290 F.3d at 586). "[T]he statement at issue in a false advertising claim must misrepresent[] the nature, characteristics, qualities, or geographic origin of a product." *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 226 (3d Cir. 2017). "If the message conveyed by an advertisement is literally true or ambiguous, however, the plaintiff must prove actual deception or a tendency to deceive, and it may do so with a properly

conducted consumer survey." *Pernod*, 653 F.3d 241 (citing *Novartis*, 290 F.3d at 588–90).

Industria asserts that Latinfood actually deceived consumers, offering the following corroborating evidence. First, one of Latinfood's distributors, Gloria Moreno, believed that Latinfood's products were associated with Industria's products. (Salazar Decl. Ex. SS.) Second, on February 5, 2022, a Twitter user sent a message to Industria's Twitter account with a picture of Latinfood's Zenú and Ranchera products and asked whether Industria had "a sales franchise for beer sausage and ranchera sausage that they are selling in New York and New Jersey and Florida, as so-called Colombian sausages." (Salazar Decl. Ex. UU.) Paola Vasquez, Industria's advertising agency manager, responded that the products are not Industria's, to which the alleged customer replied "So why are they using your brand? This makes Colombians abroad get tricked." (*Id.*) Third, a supermarket sales associate testified at deposition that Latinfood's products were sold in a store aisle with other Hispanic or Latin-sourced products, rather than in an aisle with products made in the U.S. (Kadosh Decl. Ex. 42 Perez Tr. 28:24–29:23.) Fourth, a supermarket store manager testified that Mr. Zuluaga had a reputation for selling Colombian products and that Mr. Zuluaga told him that Zenú was a brand known in Colombia. (Kadosh Decl. Ex. Rodriguez 38 Tr. 31:10–25, 29:23–30:2.) Fifth, Latinfood's packaging resembles and implies an affiliation with Industria. The packaging also includes the line "Linea De Exportacion," which translates to "exportation line." (Pl. Mot. p. 32; *see also* Pl. St. ¶ 73; Def. Resp. ¶ 73.)

According to Industria, those instances "strongly implied to [Latinfood's] customers that their products came from Colombia or were otherwise associated [with] the Colombian Zenú brand." (Pl. Mot. p. 32.) That argument, whatever its merits, falls on the wrong side of the line between a false association claim and a false advertising claim. On these facts, any mistaken belief that Latinfood's products were Industria's products depends on evidence of a false association between the brands, which is distinct from a false advertising claim. *See Parks LLC*, 863 F.3d at 227 (finding that the false

41

advertisement claim was a false association claim in disguise when it depended on the purported false association between the two brands).[31]

An arguable exception is the use of "exportation line." One country's exportation, however, is another's importation, and the meaning is unclear. Industria has not provided any evidence to support its interpretation of "exportation line" and the parties dispute the meaning of the phrase. (*See* Def. Supp. St. ¶ 23; Pl. Supp. Resp. ¶ 23.) The phrase also does not explicitly refer to Colombia (or any other country); the only country mentioned on the labels is the United States. (*See* Salazar Decl. Exs. X, Y.) "Exportation" does not indicate whether the exportation is to or from the United States. Therefore, Industria has failed to show that Latinfood's use of "exportation line" actually deceived or had a tendency to deceive consumers into believing it was a Colombian product.

There being no sufficient showing of deception, proof of the third, materiality element fails as well. The parties devote little if any attention to the fourth, interstate commerce element.

I move to the fifth, "injury" element. Section 34 of the Lanham Act authorizes courts to grant injunctive relief. 15 U.S.C. § 1116 ("[C]ourts . . . shall have power to grant injunctions, according to the principles of equity[.]"). To obtain an injunction, a plaintiff must demonstrate that "that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *BreathAsure*, 204 F.3d at 91–92. This demonstration must be "something more than a mere subjective belief that [the plaintiff] is . . . likely to be damaged." *Id.* at 93 (quotations omitted). A plaintiff must also prove that there is "a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising." *Id.* at 95 (quoting *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189–90 (2d Cir. 1980)).

Industria asserts a likelihood of injury because "Latinfood's false and misleading statements led unsuspecting customers to purchase Latinfood's

---

[31]     False association is discussed at Section IV.D., *infra*.

products on the belief that they were affiliated with Industria's brands." (Pl. Op. p. 26.) Here again, Industria conflates its false advertising claim with its false association claim. *See Parks LLC*, 863 F.3d at 227. For the reasons discussed above, at best only one of Latinfood's statements is actionable, based on Latinfood's use of Industria's logo on its website in 2016.

Industria fails to show that there is a reasonable basis for the belief it is likely to be damaged as a result of Latinfood's false advertising. *See BreathAsure*, 204 F.3d at 95. The only evidence in the record of Latinfood's use of Industria's mark on its website is from over six years ago. Nothing in the record supports that the logo is still being used or for how long it was used. Mr. Zuluaga's testimony suggests that the logo was taken down at some point. (*See* Kadosh Decl. Ex. 43 Zuluaga Tr. 184:10–18, wherein Mr. Zuluaga testified that this was "not a finalized version of the website" and was not supposed to have been on the internet.)[32] Be that as it may, no reasonable jury in 2023 could conclude that Latinfood's use of Industria's logo in 2016 is likely to cause damage to Industria in the future. I will grant Latinfood's motion for summary judgment as to the false advertising claim, and deny Industria's motion.

### C. Trade Dress Infringement

#### 1. Legal Standards/*Lapp* factors

"To establish trade dress infringement under the Lanham Act, a plaintiff must prove that (1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007). A plaintiff must also "articulat[e] the specific elements which comprise its distinct dress." *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014) (quoting *Landscape*

---

[32]   Having determined that Industria cannot satisfy the fifth element, I need not address the remaining factors.

*Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997)). *See also* 1 McCarthy on Trademarks and Unfair Competition § 8:3 (5th ed.)

A "likelihood of confusion" exists where "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991). Courts consider a variety of factors when assessing whether two marks are likely to cause consumer confusion. In this Circuit these so-called "*Lapp* factors" include, but are not limited to:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of consumers because of the similarity of function;
> (10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 471 (3d Cir. 2005) (quoting *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)). The Third Circuit has "repeatedly insisted that the *Lapp* factors are not to be mechanically tallied, but rather that they are tools to guide a qualitative decision." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 216 (3d Cir. 2000).

"The single most important factor in determining likelihood of confusion is mark similarity." *Id.* Marks are confusingly similar if "ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship." *Id.* (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994)).

### 2. The Motions for Summary Judgment

Industria moves for summary judgment on the trade dress infringement claim. Industria asserts first that Latinfood's labels and packaging designs are non-functional because they "serve only to identify the product to its respective source of business." (Pl. Mot. p. 29.) Industria also argues that Latinfood's labels and packaging are inherently distinctive because they "primarily convey[] the brand or source of the product." (*Id.*) Industria describes elements of Latinfood's packaging, but provides no description of its own packaging. (*See id.*)[33] Industria also argues that each of the *Lapp* factors weighs in favor of finding a likelihood of confusion. (*Id.* pp. 23–28, 30–31.)

Latinfood responds that, in addition to showing that its trade dress is inherently distinctive, Industria must show that its trade dress has "secondary meaning." (Def. Op. pp. 23–24.) Because Industria does not assert that its trade dress has secondary meaning, says Latinfood, its motion for summary judgment must be denied. (*Id.* p. 24.) Additionally, Latinfood asserts that each of the *Lapp* factors weighs against a finding of a likelihood of confusion. (*Id.* pp. 14–23.) Latinfood also asserts that Industria cannot show a likelihood of confusion in connection with its false association claim. (*See* Def. Mot. pp. 23–29.)[34]

---

[33] That appears to be an error, as Industria here seems to be implying what it explicitly states in its reply brief, *i.e.*, that *its own* packaging is inherently distinctive and worthy of protection. (*See* Pl. Reply pp. 15–16.) That said, the two are nearly identical, which of course is Industria's point.

[34] The presentation is somewhat disordered. On its own motion for summary judgment, Latinfood relies on *Lapp* factors two, four, and six, but says little about the others. (*See* Def. Mot. pp. 23–29.) In its reply brief, however, it asks the court to incorporate the discussion of the *Lapp* factors that it provided in response to

For the reasons stated herein, both sides' motions are denied. I nevertheless discuss these complex issues for the guidance of the parties and the structuring of the case going forward.

### 3. Discussion

#### a. Preliminary issues

I begin by discussing whether the allegedly infringing design is non-functional. "[T]he primary test for determining whether a product feature is functional is whether the feature is essential to the use or purpose of the product or whether it affects the cost or quality of the product." *Shire US Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 354 n.12 (3d Cir. 2003) (citing *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 356 (5th Cir. 2002)). There is no evidence that the product packaging is essential to the use or purpose of the product, or that it affects the cost or quality of the product, and Latinfood does not appear to disagree. Therefore, I readily conclude that the trade dress design is non-functional.

Next, I consider the question of whether the packaging and labels are inherently distinctive or have acquired secondary meaning. "Trade dress is registrable as a trademark if it serves the same source-identifying function as a trademark. Marks are entitled to protection if they are inherently distinctive, i.e., 'their intrinsic nature serves to identify a particular source of a product.'" *In re Forney Indus., Inc.*, 955 F.3d 940, 944–45 (Fed. Cir. 2020) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). Distinctiveness arises in one of two ways: "First, [trade dress] is inherently distinctive if [its] intrinsic nature serves to identify a particular source. . . . Second, [trade dress] has acquired distinctiveness, even if it is not inherently distinctive, if it has developed secondary meaning[.]" *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210–11 (2000) (citations omitted). Secondary meaning "occurs when, in the minds of the public, the primary significance of a [trade dress] is to

---

Industria's mirror-image summary judgment motion. (Def. Reply pp. 15–16.) As it appears the issues have been adequately aired, I will do so.

identify the source of the product rather than the product itself." *Id.* at 211; *see also Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 82 (3d Cir. 1982) ("When the primary significance of the trade dress to a consumer is in designating not the product but its producer, the trade dress has acquired secondary meaning.").

Industria asserts that its Zenú and Ranchera labels are inherently distinctive. (*See* Pl. Reply pp. 15–16; Pl. Mot. pp. 29–30.) Latinfood sidesteps that argument, focusing on the issue of whether Industria's trade dress has acquired secondary meaning. For support, Latinfood quotes *Wal-Mart Stores v. Samara Bros.*, wherein the Supreme Court stated that "in an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." 529 U.S. at 216 (2000); (*see* Def. Op. pp. 23–24).

Latinfood misinterprets *Wal-Mart Stores,* which required secondary meaning only in the case of a claim based on product "design, [which,] like color, is not inherently distinctive." 529 U.S. at 212. The Court therefore reasoned that

> [i]n the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing.

*Id.* at 213. That was the reason for the Court's holding that "a product *design* cannot be protected under § 43(a) without a showing of secondary meaning." *Id.* at 214 (emphasis added).

The Supreme Court in *Wal-Mart* carefully noted that its holding in *Two Pesos,* involving a claim *not* based on product design, remained undisturbed. *Id.* at 214–15. In *Two Pesos*, the Supreme Court held that the trade dress of the plaintiff's restaurant, described as "a festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings

47

and murals," could be protected without a showing of secondary meaning. *Walmart,* 529 U.S. 214–15 (citing *Two Pesos,* 505 U.S. at 765). *Wal-Mart* expressly distinguished *Two Pesos,* noting that it did not involve product design trade dress, but instead involved product packaging or something similar. *Id.* at 215. A product's packaging (unlike design), then, can be protected as trade dress under § 43(a) if it is established that the packaging is inherently distinctive; an additional showing of secondary meaning is not required. *Id.* at 214–15. *See In re Forney Indus., Inc.,* 955 F.3d 940, 946–47 (Fed. Cir. 2020) ("[N]othing in the *Wal–Mart* decision questioned or undermined our established case law regarding the circumstances under which a proposed product packaging mark may be deemed inherently distinctive." (internal quotations omitted)).

Here, Industria seeks protection for its packaging and labels, not the design of the products. (Pl. Mot. pp. 29–31; Pl. Reply pp. 15–16.) Industria's claim thus falls on the *Two Pesos* side of the *Two Pesos/Wal-Mart* divide*,* and Industria is not required to show secondary meaning. Because Latinfood's legal objection fails, and because it fails to raise a genuine issue of material fact as to the inherent distinctiveness of Industria's trade dress, I conclude that the second requirement is satisfied.

Latinfood also asserts that it is permitted to copy Industria's packaging design, based on this excerpt from the Third Circuit's decision in *Fair Wind*:

> "The purpose of trade dress protection is to 'secure the owner of the trade dress the goodwill of his business and to protect the ability of consumers to distinguish among competing producers.'" *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir.2007) (quoting *Shire U.S. Inc. v. Barr Labs., Inc.*, 329 F.3d 348, 353 (3d Cir.2003)). Trade dress protection does not shield businesses from plagiarism. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 36, 123 S. Ct. 2041, 156 L.Ed.2d 18 (2003). Indeed, "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29, 121 S. Ct. 1255, 149 L.Ed.2d 164 (2001); *see also Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d

654, 657 (7th Cir.1995) ("Copying is not only good, it is a federal right—a necessary complement to the patent system's grant of limited monopolies.").

*Fair Wind*, 764 F.3d at 308–09. Latinfood has taken this quote out of context. The Third Circuit did not hold that copying is inherently permissible, or undermine the Supreme Court case law cited above. At the conclusion of the paragraph on which Latinfood relies, the Third Circuit stated that trade dress protection is available to "incidental, arbitrary or ornamental product features which identify the product's source." *Id.* at 309. The paragraph immediately following explains that, *nevertheless*, trade dress protection is available to a plaintiff who establishes that "(1) the allegedly infringing design is nonfunctional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." *Id.* That is the test I apply here.

### b. *Lapp* factors

Having concluded (1) that the trade dress design is non-functional and (2) that the packaging and labels are protectable because they are inherently distinctive, I now consider (3) whether there is a likelihood of confusion under the *Lapp* factors. Here, I find issues of fact that bar summary judgment.

Throughout, Latinfood tends to avoid the substance of this issue, instead falling back on the argument that Industria does not sell its products in the United States. A fact finder might view this strategy as a tacit admission by Latinfood that it knocked off Industria's trade dress, but I will nevertheless analyze the underlying evidence on a summary judgment standard. Some issues of fact remain. To the extent practicable without the benefit of fact finding, however, I will perform the *Lapp* likelihood-of-confusion analysis, to assist in the structuring of the case going forward.

### i.    First *Lapp* Factor

As to the first factor, there is no genuine dispute that the overall appearance of Latinfood's Zenú packaging design is virtually identical to those of Industria, and its Ranchera packaging design is very similar.

> The single most important factor in determining likelihood of confusion is mark similarity. Marks are confusingly similar if ordinary consumers would likely conclude that the two products share a common source, affiliation, connection or sponsorship. The proper test is not side-by-side comparison but whether the labels create the same overall impression when viewed separately. Courts should compare the appearance, sound and meaning of the marks in assessing their similarity. There is no simple rule as to when marks are too similar. The degree of similarity needed to prove likely confusion will vary with the difference in the goods of the parties. Where the goods are directly competitive, the degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products.

*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 712–13 (3d Cir. 2004) (internal quotations and citations omitted). When applied to trade dress infringement cases, "[s]imilarity of appearance is properly considered paramount in trademark and product packaging trade dress infringement cases, for unless the allegedly infringing mark or dress is substantially similar to the protectable mark or dress, it is highly unlikely that consumers will confuse the product sources represented by the different marks or trade dresses." *Versa Prod. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 202 (3d Cir. 1995).

Industria explains that, for both meat and canned Zenú products, Industria's packaging includes "the Zenú brand name prominently at the top of the label in stylized red script." (Pl. Mot. pp. 29–30.) The labels also include photographs of the food contained within the packaging on a white background. (*Id.* p. 30.) For sausage Zenú products, the labeling "provides the product's name in white text against a darkly colored box in the center right of the label." (*Id.*) For canned Zenú goods, "the product name is centered beneath the brand name in italicized script and the bottom of the label comprises a solid strip of color matching the text of the product name." (*Id.*; *see generally*

Salazar Decl. Exs. V–W.) Industria contends that Latinfood's Zenú packaging for meat and canned products is nearly identical. (*See generally* Kadosh Decl. Exs. 16–17.) For comparison, images of the two are attached to this opinion as Exhibit A.

For Ranchera products, Industria explains that its packaging displays the Ranchera name in "bold, capitalized letters arched across the top of the label" over a "sunny yellow and orange background." (Pl. Mot. p. 30.) Beneath the name, the packaging displays a "sun-drenched ranch image . . . containing a frontier family eating around a camp fire." (*Id.*; *see generally* Salazar Decl. Ex. G.) Industria contends that the products are similar, although instead of using an image of a frontier family, Latinfood's Ranchera label displays an image of "men on horseback riding off into the sunset." (Pl. Mot. p. 30; *see generally* Kadosh Decl. Exs. 20–21.) Notably, Latinfood also displays the Zenú logo on its Ranchera packaging. (Pl. Mot. p. 30.)

A visual inspection is sufficient to establish the presence of this *Lapp* factor of mark similarity. Latinfood cannot really deny that the marks are very similar indeed.

Rather, Latinfood falls back on its general argument that Industria has never sold its products in the United States. (Def. Op. p. 16.) Where the products are not directly competing, says Latinfood, the similarity of the marks, even if established, should receive less weight; in such a case, "the similarity of the marks is only one of a number of factors the court must examine to determine likelihood of confusion." (*Id.* (quoting *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 282 (3d Cir. 2001)). True enough, but if Latinfood means to imply that the significance of the first *Lapp* factor is wholly negated, it is incorrect; the quoted passage signifies only that "mark similarity is not necessarily determinative of likely confusion, particularly when the products do not directly compete." *Checkpoint Sys., Inc.*, 269 F.3d at 282. Direct competition is not a necessary element, although its

presence or absence may go to the *weight* the court will ultimately give to this critical first factor.

In sum, there is a very high degree of similarity between Industria's and Latinfood's packaging, and Latinfood cannot plausibly contend otherwise.

### ii. Second *Lapp* Factor

As to the second factor, strength of the trade dress, the Court considers (1) "the inherent features of the mark contributing to its distinctiveness or conceptual strength" and (2) "the factual evidence of the mark's commercial strength or of marketplace recognition of the mark." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 184–85 (3d Cir. 2010); *see also Versa Prod. Co.*, 50 F.3d at 203 (considering the strength of the product's packaging in a trade dress infringement case).

On the first prong, Industria argues that its trade dress is distinctive because it is fanciful and arbitrary. According to Industria: "Zenú, having no meaning outside its function as a trademark, is fanciful, while Ranchera, the Spanish word for 'ranch,' does not describe the ingredients, qualities or characteristics of Industria's goods and is therefore an arbitrary mark." (Pl. Mot. p. 22; Pl. Op. p. 19.) Latinfood does not meaningfully dispute that the trade dress is distinctive. (Def. Op. pp. 16–17.)

Industria asserts that its trade dress is commercially strong because, in Colombia, it "makes approximately $300,000,000 annually in sales for its Zenú products and $100,000,000 annually in sales of its Ranchera products." (Pl. Mot. p. 24; *see* Kadosh Decl. Ex. 39 Salazar Tr. 111:12–112:3). Industria also asserts that it "spends millions on advertising both brands annually." (Pl. Mot. p. 24; *see* Salazar Decl. Ex. Q.) Industria must concede, however, that it does not actively advertise its Zenú or Ranchera products in the United States. (Def. St. ¶ 14; Pl. Resp. ¶14; Def. Supp. St. ¶ 9; Pl. Supp. Resp. ¶ 9.) For what it is worth, Industria submits evidence that its trade dress has been seen by U.S. residents; the Zenú and Ranchera websites have been visited by users located

in the United States thousands of times between 2012 and 2017. (Pl. St. ¶¶ 17–18; Def. Resp. ¶¶ 17–18.) Those views of Industria's website by users located in the United States may indicate at least some commercial strength of its trade dress.[35]

Latinfood responds, again, that the commercial-strength facts on which Industria relies are irrelevant because Industria does not sell or advertise its products in the United States. (Def. Op. pp. 16–17.) Here, Latinfood cites *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3d Cir. 2000), but that case does not truly support its position. There, the district court determined that the mark at issue had a high level of commercial strength based on the money spent on advertising, increased public recognition, and increase in sales. *Id.* at 224. The Third Circuit, albeit on clear-error review, affirmed the district court's analysis of this factor. When considering the strength of the mark, the Third Circuit rejected "a per se rule against considering the use of the mark in different markets and for unrelated products." *Id.* Indeed, *A&H Sportswear* explicitly recognizes that the mark's strength in other markets is relevant: "Although the wide use of a term within the market at issue is more probative than the wide use of a term in other markets, the extensive use of the term in other markets may also have a weakening effect on the strength of the mark." *Id.* at 223 (citation omitted).

Therefore, I conclude that a fact finder, viewing the current record, could reach a range of conclusion as to likelihood of confusion.

---

[35] Latinfood responds that website traffic cannot be used as a measure of commercial strength (Def. Op. p. 17 n. 18), citing *Klumba.UA, LLC v. Klumba.com*, 320 F. Supp. 3d 772, 778 (E.D. Va. 2018). Latinfood has a point, but presses the point too far. *Klumba*'s holding addressed an entirely different question: whether the plaintiff's service was "performed in the United States" or involved "transactions between United States citizens and the subject of the foreign nation." *Id.* at 777–78. Under that consideration, the *Klumba* court held that mere access to a website was insufficient to show business activity in the United States. *Id.* at 778.

### iii.     Third *Lapp* Factor

The third factor, consumer sophistication, has been elaborated thus: "When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion. Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." *Checkpoint Sys., Inc.*, 269 F.3d at 284; *see Sabinsa Corp.*, 609 F.3d at 186 (noting that "courts have found there is not a strong likelihood of confusion . . . [w]here the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers") (internal quotations and citation omitted).

Industria states that "Zenú and Ranchera products for both parties are inexpensive household food products marketed to ordinary consumers in local grocery stores." (Pl. Mot. p. 25.) Latinfood, again, eschews direct analysis, again falling back on Industria's lack of sales in the U.S.: "Industria has no U.S. consumers, and presents no evidence that consumers are not sophisticated. When viewed through the prism of the January 29, 2019 Stipulation (D.E. 208-1), which unequivocally stated that they do not sell or market Zenú or Ranchera products in U.S. commerce, the third *Lapp* factor weighs in Latinfood's favor." (Def. Op. p. 18.)

Neither side cites evidence as to the care with which consumers select these products. In *PB Brands, LLC v. Patel Shah Indian Grocery*, the Court suggested that intuitions are not enough to support a finding on this factor; there, the plaintiff unsuccessfully argued that customers exercised a low degree of care in selecting their grocery store because the items sold at the grocery stores cost relatively little. 331 F. App'x 975, 982 (3d Cir. 2009). The district court determined, and the Third Circuit agreed, that the third factor was neutral because "[n]either party provided sufficient evidence to elucidate" the degree of care consumers spend on choosing their grocery store. *Id.*

It is axiomatic, of course, that the purchase of a can of beans is not like the purchase of an automobile, but when it comes to food items, consumers may nevertheless have strong preferences. Because neither party has provided any evidence, this factor could be taken as neutral, but at any rate cannot be resolved on a summary judgment standard.

### iv.    Fourth and Sixth *Lapp* Factors

I discuss together the fourth and sixth factors, the length of time without confusion and evidence of actual confusion. Although evidence of actual confusion is not required, it is "highly probative of a likelihood of confusion." *Sabinsa Corp.*, 609 F.3d at 187. The Third Circuit has explained that, "the more evidence of actual confusion that a plaintiff can muster, the stronger the likelihood of confusion in the future, but lack of evidence of actual confusion (at least where the time period that the two products have been in competition is short or when the particular circumstances [do not] indicate such evidence should have been available) does not raise an inference that there is no likelihood of confusion." *Versa Prod. Co.*, 50 F.3d at 205 (internal citation and quotation marks omitted).

Industria's evidence of actual confusion includes the interactions with Ms. Moreno in 2014 (Salazar Decl. Exs. RR, SS; Def. Supp. St. ¶ 17; Pl. Supp. Resp. ¶ 17) and with an alleged customer on Twitter in February 2022 (Salazar Decl. Ex. UU; *see* description in Section IV.B., *supra*). Additionally, on an unidentified date (but some time in or after 2014), a Facebook user posted in a group titled "WikiWomen in Medellin" that she purchased "ranchera sausages" at an unidentified location in the United States and that "they say" that "Zenú set up a plant in New York for the Colombia market in the U.S.A." (Salazar Decl. Ex. TT.) The Facebook user then asked if there is a plant in New York or if "they are using the company's branding but they are not their products." (*Id.*) It appears that there were eight comments below the post, but Industria did not attach those comments. *See id.* Notably, the post does not include a picture or any other information relating to Latinfood's products in particular. (*See id.*;

*see also* Def. Supp. St. ¶ 17; Pl. Supp. Resp. ¶ 17.) The issue, it must be remembered, is not "confusion" generally, but confusion or conflation as to the products of these two parties.

Latinfood insists that this evidence is not enough, citing the Fourth Circuit's statement in *Belmora* that "[a] few isolated consumers who confuse a mark with one seen abroad, based only on the presence of the mark on a product in this country and not other misleading conduct by the mark holder, would rarely seem to [support] a viable § 43(a) claim." (Def. Op. p. 20 (citing *Belmora*, 819 F.3d at 710 n.8).) However, the discussion in *Belmora* also drew a relevant distinction between that hypothetical scenario and one in which the defendant intentionally copied the plaintiff's foreign products in order to influence purchases by consumers in the United States:

> The story is different when a defendant, as alleged here, has—as a cornerstone of its business—intentionally passed off its goods in the United States as the same product commercially available in foreign markets in order to influence purchases by American consumers. *See M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 448 (4th Cir. 1986) ("[E]vidence of intentional, direct copying establishes a prima facie case of secondary meaning sufficient to shift the burden of persuasion to the defendant on that issue."). Such an intentional deception can go a long way toward establishing likelihood of confusion. *See Blinded Veterans*, 872 F.2d at 1045 ("Intent to deceive . . . retains potency; when present, it is probative evidence of a likelihood of confusion.").

*Belmora*, 819 F.3d at 710 n.8. And the record here could permissibly bear the interpretation that Latinfood's business has passing-off as its "cornerstone."

Latinfood also relies on the testimony of Alejandro Yepes, a manager at Cordialsa, that he was not "aware of any time when a person has been confused as to who was the owner of Zenú or Rancher[a] marks in the U.S." (*See* Kadosh Decl. Ex. 40 Yepes Tr. 43:14–17), and the testimony of Luis Salazar that he does not "have any records showing a crossover of Industria and Latinfood customers between the US and Col[o]mbia" and that he stated, in response to the question of whether, to his knowledge, Latinfood and

Industria have different customers, that "Industria does not do business in the United States" (Ingber Decl. Ex. A Salazar Tr. 60:4–12). Those transcript excerpts do not invalidate the evidence cited by Industria.

A fact finder might find that Latinfood is in the passing-off business. The fact finder might also find it significant, however, that for a relevant period of eight years, Industria was able to provide only three somewhat equivocal instances of customer confusion.[36]

I conclude that the evidence on the fourth and sixth factors would not require summary judgment for either party.

### v. Fifth *Lapp* Factor

The fifth factor concerns Latinfood's intent in using the trade dress. Evidence of intent "is not a prerequisite for finding a Lanham Act violation; such evidence, however, weighs heavily in favor of finding a likelihood of confusion." *Sabinsa Corp.*, 609 F.3d at 187. "In evaluating this factor, courts must look at whether the defendant chose the mark to intentionally confuse consumers, and thereby capitalize on the senior user's goodwill, and whether the defendant gave adequate care to investigating its proposed mark." *Id.* As discussed in the first factor, Latinfood's Zenú labels are nearly identical to Industria's and its Ranchera labels are strikingly similar. In fact, Latinfood instructed its vendor to consider Industria's Zenú website when creating its product labels. (Kadosh Decl. Ex. 37 Isidor Tr. 41:9–42:9; Def. Supp. St. ¶ 20; Pl. Supp. Resp. ¶ 20.). Latinfood's vendor also testified that Mr. Zuluaga brought one of Industria's Ranchera labels to her office. (Kadosh Decl. Ex. Isidor 37 Tr. 67:19–68:8; Pl. St. ¶ 57; Def. Resp. ¶ 57.)

Latinfood's only relevant response is a conclusory statement that this evidence is disputed.[37] (*See* Def. Op. pp. 21–22.) Latinfood seems to mean that

---

[36]     The origin and admissibility of some of Industria's internet evidence is also open to question.

[37]     Latinfood also argues that it has "provided documentary evidence of how it came up with the mark Zenú by combining a portion of his family surname ZULUAGA and an abbreviation of the term "Enterprise" (combination containing the first two

it disputes *why* Mr. Zuluaga instructed his vendor to consider Industria's website and *why* he brought a label to his vendor's office, along with the other disputed instructions he provided to his vendors. As discussed above, this "read my mind" defense does not suffice when considered against the backdrop of all the concrete evidence of deliberate copying. *See* pp. 23–25, *supra*; *see also* pp. 66–69 (evidence of misrepresentations in connection with obtaining trademark).

But even assuming that Mr. Zuluaga intended to copy Industria's trade dress, this factor requires that Latinfood must also have done so with the "intent to confuse consumers." *See Sabinsa Corp.*, 609 F.3d at 187. Industria asserts that Latinfood demonstrated intent to confuse consumers in five ways. First, some of Latinfood's products state that they are manufactured exclusively for "Zenú Products US, Inc.," which Industria argues implies that the products come from a United States affiliate of a Colombian brand. (Pl. Mot. pp. 26–27; *see* Salazar Decl. Ex. X.) Second, some of Latinfood's packaging includes the line "Linea De Exportacion," which translates to "exportation line" and, according to Industria, implies that the products were exported (presumably, from Colombia), despite their actually having been manufactured in the U.S. (Pl. Mot. p. 27; *see* Pl. St. ¶ 73; Def. Resp. ¶ 73.) Third, on October 4, 2016, Latinfood's website declared, "We have products from" with Industria's Zenú logo underneath, implying an affiliation with Industria (Pl. Op. p. 25; *see* Kadosh Decl. Exs. 22, 43 Zuluaga Tr. 182:14–183:25.) Fourth, advertisements for Latinfood's Zenú products include the phrase "deliciosa tradición," which Industria states translates to "delicious tradition" and implies that Latinfood's Zenú products are connected with

---

letters of his surname ZU and the abbreviation for the term enterprise "EN") discarding as "ZABU," "ZINU" and "ZANU" after dismissing other choices such as "ZABU," "ZINU" and "ZANU."" (Def. Op. p. 21; *see* Kadosh Decl. Exs. 1, 3.) Latinfood also explains its reason for adding an accent over the U in Zenú. (*Id.*) Latinfood's argument is irrelevant to Industria's trade dress claim. Although it purports to explain how Mr. Zuluaga arrived at the name Zenú, it does not explain how Latinfood's packaging came to be nearly identical to Industria's packaging.

Industria's Zenú products. (Pl. Mot. p. 27; *see* Kadosh Decl. Exs. 24, 25.) Fifth, a supermarket store manager testified at deposition that Mr. Zuluaga had a reputation for selling Colombian products and Mr. Zuluaga told him that Zenú was a brand known in Colombia. (*See* Kadosh Decl. Ex. 38 Rodriguez Tr. 31:14–25, 29:23–30:2, 31:10–13; Pl. St. ¶ 79; Def. Resp. ¶ 79.) Latinfood disputes that the evidence creates a connection with Industria that would confuse consumers, and I recognize that most of the evidence on which Industria relies does not mention Industria or Colombia.

On the other hand, Latinfood has the tried-and-true argument that it sells in the U.S., that Industria has no customers in the U.S., that Latinfood was not privy to any plans by Industria to expand its operations here, and that Latinfood therefore did not set out to confuse its U.S. customers. Particularly because this factor concerns intent, I cannot say as a matter of law that Mr. Zuluaga's actions establish an intent to copy Industria's trade dress in a manner that would confuse U.S. consumers.

I proceed with particular caution because this factor can "weigh[] heavily in favor of finding a likelihood of confusion." *Sabinsa Corp.*, 609 F.3d at 187. I cannot grant summary judgment to either party on this factor.

### vi. Seventh, Eighth, and Ninth *Lapp* Factors

The seventh, eighth, and ninth factors address the "nature of the services provided, the customers targeted, and the methods use[d] to reach those customers." *Primepoint, L.L.C. v. PrimePay, Inc.*, 545 F. Supp. 2d 426, 444 (D.N.J. 2008) (addressing these factors together). The "greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Checkpoint Sys., Inc.*, 269 F.3d at 288-89. "When the parties target their sales efforts to the same group of consumers, there is a greater likelihood of confusion between the two marks." *Sabinsa Corp.*, 609 F.3d at 188.

Industria concedes that its sales of Zenú and Ranchera products are limited to Colombia. (Pl. Mot. p. 27.) However, Industria asserts that these factors nevertheless weigh in its favor because it intends to enter the United

States market and that, once it does so, will target "a nostalgic market of Colombians." (*Id.*) According to Industria, because Latinfood similarly targets "Hispanics and Hispanic-serving markets," this will lead to a likelihood of confusion. (*Id.*) Additionally, Industria argues that, because it and Latinfood are "purveyors of food products, and commonly of sausage and other meat products and canned vegetables," the average consumer would conclude that "Industria offered Latinfood's Zenú and Ranchera products and vice versa." (*Id.* p. 28.)

As discussed above, there is a dispute of material fact as to whether Industria concretely intends or is able to enter the United States market. *See* Section IV.A.2., *supra.* Additionally, Industria has not provided any information regarding its reputation in the United States. *See id.* Although Industria's Zenú and Ranchera websites have been visited by users located in the United States thousands of times between 2012 and 2017, there are no products for sale on those websites and there is no indication that Industria sells products to United States consumers either through its websites or in stores. For the same reason that the so-called "statutory standing" issue requires the involvement of the finder of fact, I lack a sufficient record to weigh the seventh, eighth, and ninth factors on a summary judgment standard.

*    *    *

Upon review of the relevant factors, I find that questions of fact remain. Summary judgment is denied to both sides on the claim of trade dress infringement.

### D. False-Association Trademark Infringement

The elements of a false-association trademark infringement claim under the Lanham Act track the elements of a common law trademark infringement claim: a plaintiff must prove that "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion

concerning the origin of the goods or services." *Ford Motor Co.*, 930 F.2d at 291 (internal quotation marks omitted).

Latinfood asserts that Industria has no valid trademark rights to the Zenú or Ranchera marks and that Industria offers no evidence demonstrating that its designs are "inherently distinctive." (Def. Mot. pp. 14–16; Def. Reply p. 15.) Latinfood also asserts that it is the owner of the federally registered Zenú mark and that "trademark[] rights arise from use within a geographic area." (Def. Mot. p. 15 (citing *Tally Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022–23 (11th Cir. 1989).) Industria recognizes that its marks are not federally registered in the United States but asserts that its Zenú and Ranchera marks are nevertheless protected under the Lanham Act because they are "inherently distinctive." (Pl. Op. p. 19.) Industria does not assert that its marks have secondary meaning. Industria relies on its use of the trademarks in Colombia to show its ownership of the marks. (Pl. Op. p. 18.) Both parties apply the *Lapp* factors and dispute whether there is a likelihood of confusion. (Def. Mot. pp. 23–29; Pl. Op. pp. 19–23.)

As to the first element, whether the marks are valid and legally protectable, "[i]f the mark at issue is federally registered and has become incontestible, then validity, legal protectability, and ownership are proved." *Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000). "If the mark has not been federally registered or, if registered, has not achieved incontestability, then validity depends on proof of secondary meaning, unless the unregistered or contestable mark is inherently distinctive." *Id.* (quoting *Ford Motor Co.*, 930 F.2d at 292 (footnotes omitted)). A distinctive mark is one that is fanciful, arbitrary, or suggestive. *Id.* at 438 n. 5. "Suggestive marks require consumer 'imagination, thought, or perception' to determine what the product is,'" while "[a]rbitrary or fanciful marks use terms that neither describe nor suggest anything about the product; they 'bear no logical or suggestive relation to the actual characteristics of the goods.'" *A & H Sportwear*, 237 F.3d at 221–22 (citations omitted).

There is no evidence that Industria has, or at some relevant time had, a federally registered and incontestable trademark for Zenú or Ranchera. Industria once filed a registration for a U.S. trademark for Zenú, but it is no longer in effect, and there is no evidence that the trademark ever achieved incontestability. (*See* Def. St. ¶ 2; Pl. Resp. ¶ 2.) Industria never owned a U.S. registration for Ranchera. (*See* Def. St. ¶ 4; Pl. Resp. ¶ 4.) Therefore, to maintain its trademark infringement claim, Industria must establish that its Zenú and Ranchera marks have secondary meaning or are inherently distinctive. Industria asserts that its Zenú and Ranchera marks are inherently distinctive in a single, conclusory sentence: "Zenú, having no meaning outside its function as a trademark, is fanciful, while Ranchera, the Spanish word for 'ranch,' does not describe the ingredients, qualities or characteristics of Industria's goods and is therefore an arbitrary mark." (Pl. Mot. p. 22; Pl. Op. p. 19); *see also* Sections IV.C.2 & IV.C.3.a., *supra*. While such a contention may be intuitively plausible to this American consumer, Industria does not point to any further evidence to support its position.

Assuming *arguendo* that Industria could satisfy this first factor, I look at the second: ownership of the mark.

"When determining ownership of an unregistered trademark, the Court considers (1) priority of use, and (2) market penetration." *MNI Mgmt., Inc. v. Wine King, LLC*, 542 F. Supp. 2d 389, 405 (D.N.J. 2008). "The first use test is generally proper for unregistered trademarks, taking account of the well-established common law principle of 'first-in-time, first-in-right' that rewards actual and continuous use in commerce as between market competitors." *Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*, 855 F.3d 163, 170 (3d Cir. 2017); *see also Ford Motor Co.*, 930 F.2d at 292 ("With respect to ownership of unregistered marks, the first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce.").

"[T]he trademark of a prior user should be protected from infringement by a subsequent user of the same mark only in areas where the prior user has

62

established a market for its goods[.]" *Parks LLC*, 863 F.3d at 237 n.24 (quoting *Nat. Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1394 (3d Cir. 1985)). Market penetration requires a showing of "(1) volume of sales; (2) positive and negative growth trends in the area; (3) the number of actual customers in relation to the potential number of customers; and (4) the amount of advertising in the area." *MNI Mgmt., Inc.*, 542 F. Supp. 2d at 406.

There is no sufficient evidence that Industria is the owner of the Zenú or Ranchera marks for purposes of the trademark infringement claim. Industria acknowledges that it has "never sold any goods in the United States" (Def. St. ¶ 6; Pl. Resp. ¶ 6), and in particular, Industria "does not sell or advertise Zenú or Ranchera branded products in the United States." (Def. St. ¶ 14; Pl. Resp. ¶ 14.) The only possible use in U.S. commerce occurred when Cordialsa sold "a couple of cases" of "Zenú marked beans to a bakery in Texas . . . as part of the process of planning to import Zenú-marked goods into the U.S." (Def. St. ¶ 5; Pl. Resp. ¶ 5.)[38]

Some sufficient evidence of priority of use or market penetration would be required to establish ownership of the Zenú or Ranchera marks for purposes of the Lanham Act. Although use in United States commerce is not a prerequisite for every claim, *see* Section IV.A.1, *supra*, it is a required element of this particular one.

Because Industria cannot show ownership in the U.S. of its Zenú or Ranchera marks, I will grant summary judgment to Latinfood and deny summary judgment to Industria on the false-association trademark infringement claim under the Lanham Act. I find the same with respect to

---

[38]     A U.S. company, unrelated to this action, is currently challenging the Ranchera mark as unregistrable because it potentially infringes that company's "Ranchero" mark. (*See* Def. St. ¶¶ 21–22; Pl. Resp. ¶¶ 21–22.) Although registration is not a prerequisite, "there is a difference between a mark that happens to be unregistered, and one that cannot be registered as a matter of law." *Renna v. Cnty. of Union, N.J.*, 88 F. Supp. 3d 310, 320 (D.N.J. 2014). The dispute concerning whether Industria's Ranchera mark is registrable could present a further obstacle to a finding that Industria owns the Ranchera trademark. Proceedings on that challenge, however, have been stayed pending the outcome of this action. (Def. St. ¶ 22; Pl. Resp. ¶ 22.)

Industria's claims for unfair competition under New Jersey law, N.J.S.A. 56:4-1, -2 (Counts 15 and 16), because Industria's state law claims are based on its Zenú and Ranchera trademark rights. (*See* Compl. ¶¶ 199–216.) I therefore will deny Industria's motion for summary judgment and grant summary judgment to Latinfood on those claims.

### E. Source Misrepresentation

Latinfood and Industria both move for summary judgment on Industria's source-misrepresentation claim pursuant to Section 14(3) of the Lanham Act (Count 11). "The Lanham Act provides that a third party may petition for cancellation of a registered trademark if the registration was procured by fraud." *Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*, 855 F.3d 163, 174–75 (3d Cir. 2017) (citing 15 U.S.C. §§ 1064(3), 1120). For such a claim to succeed, "a showing . . . must be made by clear and convincing evidence that the 'applicant or registrant knowingly ma[de] a false, material representation with the intent to deceive the PTO. That intent to deceive can be inferred from indirect or circumstantial evidence, indicating that the registrant actually knew or believed that someone else had a right to the mark'" *Id.* (internal citations omitted) (quoting *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009); citing *Marshak v. Treadwell*, 240 F.3d 184, 196 (3d Cir. 2001)).

Section 14(3) of the Lanham Act provides, in pertinent part:

[a] petition to cancel a registration of a mark, stating the grounds relied upon, may, upon payment of the prescribed fee, be filed as follows *by any person who believes that he is or will be damaged*, including as a result of a likelihood of dilution . . . under section 1125(c) . . . by the registration of a mark on the principal register established by this chapter, or under the Act of March 3, 1881, or the Act of February 20, 1905:

(3) . . . [if] its registration was obtained fraudulently or contrary to the provisions of section 1054 of this title or of subsection (a), (b), or (c) of section 1052 of this title for a registration under this chapter, or contrary to similar prohibitory provisions of such prior Acts for a registration under such Acts, or if the registered mark is being used by, or with the permission of, the registrant so as to misrepresent

the source of the goods or services on or in connection with which
the mark is used.

15 U.S.C. § 1064(3) (emphasis added).

### 1. Latinfood's Motion for Summary Judgment

Latinfood asserts the familiar grounds that Industria's source-
misrepresentation claim must fail because Industria has no trademark rights
in the Zenú and Ranchera marks and has not sold its products in the United
States. (Def. Mot. pp. 14–16.) Industria responds that Latinfood's argument
"misconstrues the scope and purpose of Section 14(3)." (Pl. Op. p. 29.)
Industria relies on the text of 15 U.S.C. § 1064, which permits "any person who
believes that he is or will be damaged . . . by the registration of a mark" to
petition for cancellation of a trademark. (*Id.*) Therefore, Industria argues, it "is
not required to establish trademarks rights in the U.S. in order to bring a
cancellation petition under Section 14(3)." (*Id.*) All that is required, says
Industria, is that it have "a reasonable belief of damage arising from
Defendants' registration," a burden which Industria can satisfy "by the fact
that Defendants' registration and use of the Zenú mark has prevented
Industria from introducing its Zenú-marked products in the U.S., . . . and
prevented Industria from registering its own Zenú mark in the U.S." (*Id.* pp.
29–30.)

Here it is important to keep in mind that this Section 14(3) claim is not
one for infringement damages *per se*, but for cancellation of a mark. I agree
that Industria is not required to establish United States trademark rights to
petition for cancellation of Latinfood's Zenú mark. *See Australian Therapeutic
Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 1374 (Fed. Cir. 2020)
("Entitlement to a cause of action under § 1064 is not contingent on whether a
petitioner has proprietary rights in its own mark."). Industria is also not
required to have sold its products in the United States. *See id.* Rather, "[a]
petitioner may demonstrate a real interest and reasonable belief of damage
where the petitioner has filed a trademark application that is refused
registration based on a likelihood of confusion with the mark subject to

cancellation." *Id.* at 1375 (citing *Empresa Cubana del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 1274–75 (Fed. Cir. 2014)). In *Empresa Cubana*, the Federal Circuit held that a trademark application is a "legitimate commercial interest," which satisfies the "real interest" requirement, and "blocking" an application can satisfy the belief of damage requirement. 753 F.3d at 1275.

Here, Industria has shown a legitimate commercial interest because it applied to the USPTO for registration of its Zenú mark. (*See* Kadosh Decl. Ex. 28.) Industria has also shown a belief of damage because Industria's trademark application is currently suspended pending the outcome of this civil proceeding. (*See* Kadosh Decl. Ex 29.)

Therefore, Latinfood's arguments that Industria cannot maintain its source misrepresentation claim are without merit, and I will deny Latinfood's motion for summary judgment.

## 2. Industria's Motion for Summary Judgment

I turn to the separate question of whether Industria is entitled to summary judgment on its source-misrepresentation claim. Industria asserts that Mr. Zuluaga's application to the USPTO to register the Zenú mark was fraudulent in three ways. (Pl. Mot. p. 39.) For the reasons discussed below, any one of Industria's arguments would warrant summary judgment in its favor on the source misrepresentation claim.

First, Industria asserts that Mr. Zuluaga "made his attestation that no other corporation had the right to use the Zenú mark in commerce with full knowledge of Industria's prior right to the mark." (*Id.*) Latinfood[39] has two responses: (a) that it, and particularly Mr. Zuluaga, had no knowledge of

---

[39]    At the time Mr. Zuluaga filed the trademark application for the Zenú mark, he was operating HWZ; hence, HWZ is listed as the owner of the trademark on the application. (*See* Kadosh Decl. Ex. 4.) As discussed in Section I.A., *supra*, on the same day that the USPTO registered the Zenú trademark to HWZ, HWZ recorded an assignment of its entire interest in the Zenú trademark to Latinfood, the successor company to HWZ. (*See* Pl. St. ¶¶ 36–37; Def. Resp. ¶¶ 36–37; Def. St. ¶¶ 16–17; Pl. Resp. ¶¶ 16–17.) With that in mind, for consistency, the use of Latinfood in this section should be construed as referring to HWZ, where appropriate.

Industria's Zenú mark at the time of its application, and (b) that USTM is solely to blame for the falsehoods contained in the application. (*See* Def. Op. p. 29–31.) Neither is sufficient.

As part of the application, Mr. Zuluaga himself signed a declaration stating:

> to the best of his/her knowledge and belief, no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive.

(Kadosh Decl. Ex. 4.) As discussed above, there is overwhelming evidence in the record demonstrating that Latinfood had knowledge of Industria's Zenú mark when it filed its Zenú application with the USPTO. *See* discussion at pp. 23–25, *supra*. Additionally, there is no evidence in the record to support Latinfood's position that USTM unilaterally submitted false information to the USPTO. In fact, the record establishes that the opposite is true. *See id.* Therefore, I conclude that the record contains clear and convincing evidence that Mr. Zuluaga falsely claimed in his USPTO application that no other corporation had the right to use the Zenú mark in commerce. The statement was material because, as the application warned, its falsity could affect the validity of the application or any resulting registration. (*See* Kadosh Decl. Ex. 4.) Mr. Zuluaga's intent to deceive the USPTO is evident based on his knowledge of Industria's Zenú mark at the time of his application and his use of images of Industria's products as his own.

Industria's second and third claims of fraud concern the date on which Latinfood first used the Zenú mark in commerce. Industria asserts that Mr. Zuluaga's application "attaches specimen photos purporting to show use in commerce that were in fact photos of Industria's Zenú products and, thus, does not show use of the mark by Latinfood at any time" and "states that Latinfood's predecessor had used the Zenú mark in commerce since January 1, 2011, despite no use in commerce until at earliest 2013, after the application

was filed." (Pl. Mot. p. 39.) Indisputably, the images attached to Latinfood's application are of Industria's products. (Pl. St. ¶ 33; Def. Resp. ¶ 33; *see* Kadosh Decl. Ex. 4); *see* Section III.B.2, *supra.* Furthermore, in response to a request from the USPTO for additional images, Mr. Zuluaga sent USTM images of Industria's products and asked that USTM upload those images in connection with the application. *See* Kadosh Op. Decl. Ex. 46; discussion Section III.B.2, *supra.* Additionally, Industria has met its burden of showing that Latinfood never used the Zenú mark in commerce prior to filing its application on January 25, 2013. On May 24, 2013, Mr. Zuluaga stated in an email to USTM that he had not printed any packaging materials and was waiting for approval of the registration application to do so because "there will be people who will try to stop it." (Pl. St. ¶ 35; Def. Resp. ¶ 35; Kadosh Decl. Ex. 6.) Mr. Zuluaga did not connect with Cibao, the company hired to create Latinfood's product labels and recipes, until 2013. (Kadosh Decl. Ex. 37 Isidor Tr. 31:9–15 (stating that Cibao began working with Mr. Zuluaga in 2013); Kadosh Decl. Ex. 15 (Aug. 21–23, 2013 email between Mr. Zuluaga and Ms. Isidor discussing a contract for their project).)

Nevertheless, Latinfood insists that it had sales of its Zenú products in 2011.[40] For support, Latinfood cites to an email between counsel wherein Mr. Ingber provided "all extant sales documents related to HWZ's 2011–2013 sales of the Zenú and Ranchera marks." (*See* Ingber Op. Decl. Ex. 3.) The email purports to attach a document titled "HWZ 2010-2011 Invoices.pdf"; however, Latinfood fails to provide either the attachment itself or an explanation of how the attachment supports its claim. Latinfood fails to cite to any evidence in the record to show that it used the Zenú mark in commerce as of January 1, 2011, the claimed date of first use, or prior to January 25, 2013, the date on which the application was filed.

---

[40]     In the discussion of another issue, above, I accepted this factual proposition, but only *arguendo,* because it did not affect the issue. *See* pp. 28–29 & n.24, *supra.*

Latinfood also asserts that, even if it falsely claimed to have used the Zenú mark in commerce as early as January 1, 2011, "a misstatement of a date of first use in a registration cannot, in and of itself, afford a basis for the cancellation thereof." (Def. Op. pp. 31–32.) However, Mr. Zuluaga did not simply "misstate" a date of first use on his application; he attempted to show prior use of the Zenú mark on market shelves by submitting photos of Industria's products as his own. As to materiality, Mr. Zuluaga filed his application pursuant to Section 1(a) of the Lanham Act, codified at 15 U.S.C. § 1051(a), which requires prior use in commerce. (*See* Kadosh Decl. Ex. 4.) Because there is no evidence that Latinfood used the Zenú mark in commerce prior to filing the application, the statement was material. Finally, intent to deceive the USPTO can be inferred for the same reasons discussed above.

Therefore, summary judgment is granted in favor of Industria on the source-misrepresentation claim.

### F. Attorney's Fees Under the Lanham Act

Both Industria and Latinfood seek attorney's fees. Under the Lanham Act, a "court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). "Before deciding whether an award of attorney's fees is appropriate in a given case . . . a court must determine whether the party seeking fees has prevailed in the litigation." *CRST Van Expedited, Inc. v. E.E.O.C.*, 136 S. Ct. 1642, 1646 (2016) (citations omitted). Cases are exceptional for purposes of the Lanham Act when "(a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an 'unreasonable manner.'" *Fair Wind*, 764 F.3d at 313.

Neither side has fully prevailed on all of its claims. Therefore, I defer the determination of whether to award attorney's fees until final disposition of this matter. *See McKenna v. City of Philadelphia*, 649 F.3d 171, 173 n.1 (3d Cir. 2011) (finding the argument that the district court erred in deferring a determination on the award of attorney's fees and costs was without merit).

Industria's and Latinfood's motions for an award of attorney's fees pursuant to 15 U.S.C. § 1117 are denied without prejudice to refiling just prior to entry of final judgment in this case.

### G. Copyright Claims

Latinfood moves for summary judgment on Industria's copyright infringement claims (Counts 5 through 10), asserting that such claims are barred by the statute of limitations. (Def. Mot. p. 29.) Industria does not move for summary judgment on its copyright claims.

No civil action for copyright infringement may be brought "unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). The Third Circuit, however, recognizes that the "discovery rule" may postpone accrual of a cause of action until "the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim." *William A. Graham Co. v. Haughey*, 568 F.3d 425, 438 (3d Cir. 2009) (internal quotation marks omitted). When the discovery rule is implicated, it is defendant's burden to demonstrate that "storm warnings" placed the plaintiff on notice of a potential claim; the burden then shifts to plaintiff "to show that [it] exercised reasonable due diligence and yet [was] unable to discover [its] injuries." *Id.* (alterations in original).

"Storm warnings 'may take numerous forms,' such as 'any financial, legal or other data that would alert a reasonable person'" to the probability that infringement had occurred. *In re Merck & Co., Inc., Secs, Derivative & "ERISA" Litig.*, 543 F.3d 150, 162 (3d Cir. 2008); *see also Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 252 (3d Cir. 2001) (noting that a "mix of information may constitute a storm warning in the aggregate") (internal quotation marks omitted). Whether "storm warnings" existed is an objective inquiry. *In re Merck & Co.*, 543 F.3d at 162.

Latinfood and Industria agree that accrual of the three-year statute of limitations is subject to the "discovery rule." (Def. Mot. p. 31; Pl. Op. p. 42.) However, the parties disagree as to when Industria should have perceived

"storm warnings." According to Latinfood, Industria learned of Latinfood's product designs in October 2013, but did not file its copyright infringement claims until April 21, 2017. (Def. Mot. p. 32.) For support, Latinfood relies on the deposition testimony of Industria's commercial manager of marketing (*see* Kadosh Decl. Ex. 39; Ingber Decl. Ex. A) and an email dated October 19, 2013, informing Industria that a "pirate from New York" had attempted to print packaging labels bearing Industria's Zenú mark (*see* Salazar Decl. Ex. S).[41] Luis Salazar, Industria's commercial manager, testified to the effect that Industria became aware of Latinfood's use of the Zenú mark in or around October 2013:

> Q: Is it true that Industria found out about Latinfood's use of the Zenú mark in or around October of 2013?
>
> A: Yes.
>
> . . .
>
> Q: Industria became aware of Latinfood's use of the Zenú mark in the US in October of 2013 when Marquillas contacted Industria to inform them about Latinfood's activity; is that correct?
>
> A: Within my knowledge that's correct.
>
> [The examiner refers the deponent to paragraph 65 of the Amended Complaint, which states: "Upon discovering Defendants' registration of the ZENÚ mark and after conducting an investigation into Defendants' business, Plaintiff commenced a proceeding before the Trademark Trial and Appeal Board seeking the cancellation of Defendants' ZENÚ mark. This proceeding is still pending."]

---

[41] Latinfood, while relying on the "pirate" email for statute of limitations purposes, inconsistently denies in its Statement of Supplemental Facts that it is the "pirate" to which the email refers. (*See* Def. Supp. St. ¶¶ 1–7.) Those facts do not change my analysis, however, because I conclude that Industria can recover for the copyright claims for the three years preceding its filing of the complaint. Dismissal is therefore not appropriate.

Q: . . . Did this investigation by Industria into Latinfood's business begin in October of 2013 when Marquillas informed Industria of Latinfood's activity?

A: When Industria became aware of all of that information it was immediately handled through the attorneys. I don't remember the exact date.

(Ingber Decl. Ex. A Salazar Tr. 44:8-11, 55:8-56:13.) Industria's petition for cancellation of Latinfood's Zenú trademark registration was filed with the TTAB on September 9, 2014. (Pl. St. ¶ 115; Def. Resp. ¶ 115.)

Industria acknowledges that it "first became [] aware of Latinfood's attempt to pirate of the Zenú mark in October of 2013," but asserts that it did not know "the full extent of Latinfood's conduct or infringement" at that time. (Pl. Resp. ¶ 42.) As to the Ranchera mark, Industria responds that neither the deposition testimony nor the email contains any specific reference to Latinfood's possible use of the Ranchera mark or trade dress. Therefore, says Industria, Latinfood failed to show the date on which Industria should have been alerted to the basis for its copyright infringement claim in connection with the Ranchera mark and trade dress. (Pl. Op. p. 43.)[42]

Industria admits that it "first became [] aware of Latinfood's attempt to pirate of the Zenú mark in October of 2013." (Pl. Resp. ¶ 42.) Based on the deposition testimony, the October 2013 email prompted an investigation, which led to Industria's filing of the trademark claim with the TTAB less than one year later. (*See* Ingber Decl. Ex. A Salazar Tr. 44:8-11, 55:8-56:13.) That evidence satisfies Latinfood's burden of showing that Industria was at least

---

[42]     In response, Latinfood states that its "Latinfood Zenú Ranchera Sausage Design" has been registered with the U.S. Copyright Office since March 2019 and therefore cannot infringe Industria's Ranchera design. (Def. Reply p. 23.) That response is immaterial to the statute of limitations issue, because the March 2019 date falls after Industria had already filed its copyright infringement claims in April 2017. To the extent Latinfood is attempting to raise a new reason for dismissal, *i.e.,* noninfringement, such an argument would not appropriately be raised in a reply brief. Latinfood's memorandum of law in support of its motion for summary judgment on the copyright infringement claims is limited to the statute of limitations.

"alerted" to the "probability" that copyright infringement, too, had occurred in October 2013 with respect to its Zenú mark and trade dress.

With respect to the Ranchera mark, however, Latinfood has not met its burden. The evidence on which Latinfood relies relates only to the Zenú mark; it says nothing about when Industria learned of Latinfood's use of the Ranchera mark. Therefore, I will deny Latinfood's motion for summary judgment on Industria's copyright infringement claims related to the Ranchera mark and trade dress.

Returning to the Zenú mark, Industria insists that (1) its copyright infringement claims with respect to its Zenú mark, added by amendment on April 21, 2017, relate back to its original filing of the complaint on October 5, 2016; and, (2) even if its claims do not relate back, Latinfood's copyright infringement was a continuing harm and Industria should be able to pursue its copyright infringement claims accruing less than three years before the filing of the Amended Complaint, *i.e.,* back to April 21, 2014. (Pl. Op. pp. 43–44.) I address each argument in turn.

As to Industria's first, relation-back argument, Federal Rule of Civil Procedure 15 provides as follows: "An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Thus, an amendment is deemed to "relate back" as long as the "original and amended petitions state claims that are tied to a common core of operative facts." *Mayle v. Felix*, 545 U.S. 644, 664 (2005). However, "[a]n untimely claim 'does not relate back . . . when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.'" *Whitaker v. Superintendent Coal Twp. SCI*, 721 F. App'x 196, 201 (3d Cir. 2018) (quoting *Mayle*, 545 U.S. at 650)). The United States Court of Appeals for the Third Circuit has defined the rationale of the relation-back theory as follows:

> In searching for a common core of operative facts in the two pleadings, courts should remain aware that the touchstone for relation back is fair notice, because Rule 15(c) is premised on the theory that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide. Thus, only where the opposing party is given fair notice of the general fact situation and the legal theory upon which the amending party proceeds will relation back be allowed. For example, we have held that amendments that restate the original claim with greater particularity or amplify the factual circumstances surrounding the pertinent conduct, transaction, or occurrence in the preceding pleading fall within Rule 15(c) because the opposing party will have had sufficient notice of the circumstances surrounding the allegations contained in the amendment.

*United States v. Santarelli*, 929 F.3d 95, 101 (3d Cir. 2019) (internal citations and quotations omitted). Industria's copyright infringement claims do not relate back to its original complaint because its trademark and copyright claims are based on different legal theories and require proof of distinct facts.

"To establish a claim of copyright infringement, a plaintiff must establish: (1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 66 (3d Cir. 2018) (quoting *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002)). Although "copyright protection is both instant and automatic," *Georgia v. Public Resource Org., Inc.*, 140 S. Ct. 1498, 1513 (2020), ownership of a valid copyright is essential to bringing a copyright infringement claim, *see McGraw-Hill*, 909 F.3d at 66. Indeed, Industria does not even claim to have owned a valid copyright at the time it filed the original complaint; it did not obtain a valid copyright until some three months later, in December 2016. (*See* Def. St. ¶ 24; Pl. Resp. ¶ 24.) Therefore, Latinfood could not have been on notice of any copyright claim when Industria initiated this action.

Industria's second argument fares better. "In continuing infringement cases such as this, '[e]ach act of infringement is a distinct harm giving rise to

74

an independent claim for relief.'" *William A. Graham Co. v. Haughey*, 568 F.3d 425, 433 (3d Cir. 2009) (quoting *Stone v. Williams*, 970 F.2d 1043, 1049 (2d Cir.1992)). "A statute of limitations creates a procedural bar to seeking a remedy . . . but does not extinguish a plaintiff's underlying rights." *United States v. Norwood*, 49 F.4th 189, 217 (3d Cir. 2022); *see also Stone*, 970 F.2d at 1051 (recognizing the "long established rule that statutes of limitations bar remedies, not the assertion of rights."). Accordingly, Industria's copyright infringement claims will not be dismissed in their entirety, but may be asserted for violations occurring during the three years prior to the filing of its Amended Complaint, *i.e.,* for the period starting from April 21, 2014.

### H. Tortious Interference Counterclaim

Under New Jersey law, a claimant alleging tortious interference with prospective economic advantage must show that (1) it had a reasonable expectation of economic advantage; (2) the interference was done intentionally and with malice; (3) the interference caused the loss of prospective gain; and (4) the injury caused damage. *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751 (1989); *see Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 382 (3d Cir. 2016).

Industria moves for summary judgment dismissing the tortious interference counterclaim because Latinfood has failed to provide evidence of the second or third elements: malice and a reasonable likelihood that the interference caused the loss of the prospective gain. (Pl. Mot. p. 49.) Latinfood does not move for summary judgment on this claim.

On July 15, 2015, a sales manager for Cordialsa visited a supermarket which sold Latinfood's Zenú products. (Pl. St. ¶ 120; Def. Resp. ¶ 120.) The sales manager told the supermarket's store manager "that he was 'surprised to find' Zenú marked products at the store" because it was "clear to [him] that [Cordialsa was] not importing the product[s] from Colombia." (Pl. St. ¶ 121, 123; Def. Resp. ¶ 121, 123.) The sales manager told the store manager "that the [Zenú] product was not imported by [Cordialsa]." (Pl. St. ¶ 126; Def. Resp.

¶ 126.) The sales manager pointed out to the store manager some products that the supermarket was "not supposed to be selling . . . because there's supposedly an unauthorized supplier supplying it" and, "before anything happens, it's better to just remove it from the selling floor -- from the sales floor." (Pl. St. ¶ 128, 130; Def. Resp. ¶ 128, 130.) The sales manager also said that the products "w[ere]n't an authentic brand under the Zenú brand." (Pl. St. ¶ 129; Def. Resp. ¶ 129.) The sales manager did not tell the store manager that the Zenú products on the supermarket shelves were "rotten," "spoiled" or of "inferior quality." (Pl. St. ¶ 131; Def. Resp. ¶ 131.) The sales manager also did not say that the "products were illegal." (Pl. St. ¶ 132; Def. Resp. ¶ 132.)

The issue as presented is whether the sales manager's stated that Latinfood's products were "fake." (*See* Pl. St. ¶ 127; Def. Resp. ¶ 127; Pl. Br. p. 17; Def. Op. pp. 38, 41.) However, even if he did, Industria asserts that the sales manager could not have acted with malice because he only stated the truth: "Latinfood's Zenú products[] were not authorized products by Industria, which he knew produced the brand" (Pl. Mot. p. 49), and therefore could reasonably be described as "fake." Industria further argues that, even if Latinfood's use of Industria's mark and trade dress was not prohibited by law, it was not unreasonable for the sales manager to believe that it was. (*Id.*) According to Industria, because the sales manager had a "good-faith belief" in his statements, he did not act with malice. (*Id.* pp. 49–50.)

Latinfood responds that, although it is not improper to give truthful statements, the manner in which the sales manager delivered his statements evinced malice. (Def. Op. p. 39 (quoting C.*R. Bard, Inc. v. Wordtronics Corp.*, 235 N.J. Super. 168, 173 (N.J. Super. Ct. Law Div. 1989)).

Malice "is determined on an individualized basis, and the standard is flexible, viewing the defendant's actions in the context of the facts presented." *Lamorte Bums & Co. v. Walters*, 167 N.J. 285, 306 (2001). "The conduct must be both 'injurious and transgressive of generally accepted standards of common morality or of law,'" and "[t]he line clearly is drawn at conduct that is

fraudulent, dishonest, or illegal and thereby interferes with a competitor's economic advantage." *Id.* at 306–07 (internal citations omitted). As I recognized in my prior motion to dismiss opinion, the parties' dispute over the sales manager's statements implicated issues "at the heart of this lawsuit." (DE 95 at p. 12.) At this point, however, we have a more developed factual record. For the reasons expressed above, Industria's assertion of its trademark rights (if that is what happened, *see infra*) would have had a substantial foundation; even if its position is not ultimately borne out, it does not meet the high bar of malice. Failure to establish the element of malice is sufficient to defeat the claim

Industria also asserts in the alternative that the sales manager's purported interference did not cause Latinfood to lose prospective gains. Although the supermarket "continued to sell Latinfood's Zenú products for months after the incident," it did stop selling Latinfood's products at some point. The only cited evidence as to the reason the sales stopped is the store manager's ambiguous testimony:

> Q. Did you mention to [Mr. Zuluaga] at the time that you weren't going to reorder the product?

> A. I don't remember why we stopped ordering it. I don't remember why. Like I said, I didn't remove it from the shelf, we just sold out and never ordered again for whatever reason. I would guess that it was because we weren't supposed to sell it and that's why we never got it --

> Q. Okay.

> A. -- again.

(Kadosh Decl. Ex. 38 Rodriguez Tr. 22:15–24; *see* Pl. St. ¶ 146; Def. Resp. ¶ 146.) Industria focuses on the store manager's statement that he could not remember why the supermarket stopped ordering Latinfood's products. (Pl. Mot. p. 50.) Latinfood, in contrast, focuses on the store manager's testimony that he "would guess" that the supermarket stopped ordering its products because "we weren't supposed to sell it." (Def. Op. p. 38.) The supermarket manager's testimony, even viewed in the light most favorable to Latinfood, does

not create a triable factual issue; the manager frankly acknowledged that he did not possess factual information as to the store's reasons for discontinuing sales of Latinfood products, but proffered a "guess." That admittedly non-factual guess is insufficient to repel a motion for summary judgment.[43]

Therefore, I will grant Industria's motion for summary judgment on Latinfood's tortious interference claim.

## V. CONCLUSION

For the reasons set forth above, Industria's motion for summary judgment **GRANTED in part and DENIED in part** and Latinfood and Zuluaga's motion for summary judgment is **GRANTED in part and DENIED in part**. As to defendants' counterclaims, Industria and Cordialsa's motion for summary judgment is **GRANTED**.

An appropriate order follows.

Dated: June 27, 2023

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**

---

[43]     The sub-issue of loss itself is also disputed. "A plaintiff need not identify multiple lost business opportunities to establish a cause of action for tortious interference, but it must identify one." *Austar Int'l Ltd. v. AustarPharma LLC*, 425 F. Supp. 3d 336, 358 (D.N.J. 2019) (citing *Am. Millennium Ins. Co. v. First Keystone Risk Retention Grp., Inc.*, 332 F. App'x 787, 790 (3d Cir. 2009) (indicating that to state a claim for tortious interference under New Jersey law a plaintiff must identify at least a "single, specific customer" that it lost or could have acquired)). Industria asserts that "Latinfood's own sales data produced in discovery shows no discernable decline in sales that can be attributed to the July 15, 2015 incident." (Pl. Mot. p. 50.) In response, Latinfood asserts that it lost business when the supermarket ceased carrying its Zenú branded products. (Def. Op. p. 40.) The ambiguity of the store manager's testimony also casts doubt on this sub-issue.

# EXHIBIT A



IAZ_DNJ0001493

IAZ_DNJ0001498



IAZ_DNJ0001494



IAZ_DNJ0001496



IAZ_DNJ0003447



IAZ_DNJ0003445





CONFIDENTIAL                    LATIN013208



Case: 23-2357   Document: 9   Page: 93   Date Filed: 08/18/2023

CONFIDENTIAL

LATIN012991





Zenú Products, US. / www.Zenu.us.com

CONFIDENTIAL LATIN012995

# EXHIBIT B

The Wayback Machine - https://web.archive.org/web/20220926214444/https://www.latinfoodus.com/product/sal…

My List

Search for products

Home    |    About LatinFood    |    Products    |    Contact Us





# Salchicha Ranchera Tradicional

$46.11



1

Add to cart

Category: Meat

Marca Zenu

Share:

Additional information    Reviews (0)

# Additional information

Brand                                          Zenú

# Related products





Quick View

Meat
97 % Honey Ham

$21.00

Add to Cart          View Cart



Quick View

Meat
97 % Smoked Ham

$21.00

Add to Cart          View Cart

                    

Quick View

Meat
Chorizo Antioqueño

$36.00

Add to Cart          View Cart

## Help

Terms & Conditions
Privacy Policy
Refund Policy
Return policy
About Us

## Quick Links

Facebook
Instagram
YouTube
Pinterest
Twitter

## Shop

Products
Cart
Wishlist
My Account
Contacts

## Subscribe to our Newsletter

Email *

Subscribe!

Latinfoods © 2018 / All Rights Reserved



**AEO CIB-000289**

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **INDUSTRIA DE ALIMENTOS ZENU S.A.S.,**<br><br>      **Plaintiff/Counter Defendant,**<br><br>      **v.**<br><br>**LATINFOOD U.S. CORP. d/b/a ZENU PRODUCTS CO. and WILSON ZULUAGA,**<br><br>      **Defendants/Counter Claimants/Third Party Plaintiffs,**<br><br>      **v.**<br><br>**CORDIALSA USA, INC.**<br><br>      **Third Party Defendant,** | Civ. No. 16-6576 (KM) (MAH)<br><br>**ORDER** |

THIS MATTER having come before the Court on the parties' cross-motions for summary judgment and attorney's fees (DE 265, 268, 274); and the Court having considered the submissions of the parties (DE 265, 266, 267, 268, 269, 273, 274, 275, 279, 280); for the reasons stated in the accompanying Opinion, and for good cause shown;

      **IT IS** this 27th day of June, 2023,

      **ORDERED** that Plaintiffs' motion for summary judgment (DE 265) is **GRANTED** with respect to Plaintiffs' claim for source misrepresentation (Count 11) and Defendants' cross/counterclaim for tortious interference; and it is further

      **ORDERED** that Plaintiffs' motion for summary judgment (DE 265) is **GRANTED** with respect to Plaintiffs' claims for violation of Article 8 of the Inter American Convention for Trademark and Commercial Protection ("IAC") with

respect to the Zenú mark (Count 12) and violation of Article 18 of the IAC with respect to the Zenú and Ranchera marks (Count 13), except that the effect of this ruling is **STAYED** pending compliance with the decretal paragraph immediately following; and it is further

ORDERED that, within 30 days of the date of this Order, Industria shall provide appropriate authentication of its registration of the Zenú and Ranchera marks in Colombia or otherwise establish the authenticity of the Colombian registration, with Latinfood to submit any opposition within 14 days thereafter; and it is further

ORDERED that Plaintiffs' motion for summary judgment (DE 265) is **DENIED** in all other respects; and it is further

ORDERED that Defendants' motion for summary judgment (DE 268) is **GRANTED** with respect to Plaintiffs' claims for false association trademark infringement (Counts 1 and 2); false advertising (Count 3); violation of Article 7 of the IAC with respect to the Zenú and Ranchera marks (Count 12); violation of Article 8 of the IAC with respect to the Ranchera mark (Count 12); and unfair competition under New Jersey law (Counts 15 and 16); and it is further

ORDERED that Defendants' motion for summary judgment (DE 268) is **DENIED** in all other respects; and it is further

ORDERED that the parties' cross-motions for attorney's fees are denied without prejudice to resubmission at the appropriate time, in accordance with the accompanying Opinion.

For ease of reference, the remaining claims in the case (subject to authentication of Colombian records) would be violation of Articles 12, 16, 17, and 31 of the IAC (Counts 13, 14); trade dress infringement (Count 4); and copyright infringement (Counts 5 through 10).

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**

2